IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. |
| | ) |
| CITGO PETROLEUM CORPORATION and | ) |
| PDV MIDWEST REFINING, LLC, | ) |
| | ) |
| Defendants, | ) |

_____)

## **COMPLAINT**

The United States of America ("United States"), by the authority of the Attorney General and through the undersigned attorneys, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

## **NATURE OF ACTION**

1.     This is a civil action against CITGO Petroleum Corporation and PDV Midwest Refining, LLC (collectively "CITGO") pursuant to the following statutory provisions: Sections 113(b) and 167 of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7413(b) and 7477; Sections 109(c) and 113(b) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9609(c) and 9613(b); and Section 325(b)(3) of the Emergency Planning and Community Right-To-Know Act ("EPCRA"), 42 U.S.C. § 11045(b)(3).

2.      This Complaint is for civil penalties and injunctive relief based on the following alleged violations at a petroleum refinery located in Lemont, Illinois ("Lemont Refinery"):

      a.      The Prevention of Significant Deterioration ("PSD") requirements contained in Part C of Title I of the CAA, 42 U.S.C. § 7470-7492, and the regulations promulgated thereunder at 40 C.F.R. § 52.21 ("PSD Regulations");

      b.      The Non-Attainment New Source Review ("Non-Attainment NSR") requirements contained in Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515, and the regulations promulgated thereunder at 40 C.F.R. § 51.165, Part 51, Appendix S, and § 52.24 ("NSR Regulations");

      c.      The New Source Performance Standards ("NSPS") promulgated at 40 C.F.R. Part 60, Subparts A, J, VV, and GGG, pursuant to Section 111 of the CAA, 42 U.S.C. § 7411;

      d.      The requirements of Title V of the CAA found at 42 U.S.C. §§ 7661a(a), 7661b(c), 7661c(a), and the regulations promulgated thereunder at 40 C.F.R. §§ 70.1(b), 70.5(a) and (b), 70.6(a) and (c), and 70.7(b);

      e.      The portions of the Title V permit for the Lemont Refinery that adopt, incorporate, or implement the provisions cited in Subparagraphs 2.a–2.d and 2.f;

      f.      The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements the federal requirements set forth in Subparagraphs 2.a–2.e; and

      g.      Upon information and belief, the emergency notification requirements of CERCLA, 42 U.S.C. § 9603(a), and EPCRA, 42 U.S.C. § 11004(b).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355; Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b) and 7477; Sections 109 of CERCLA, 42 U.S.C. § 9609(c); and Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3).  This Court has personal jurisdiction over CITGO, which does business in the State of Illinois and in this judicial district.

4.     Venue is proper in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b); 28 U.S.C. §§ 1391(b) and (c) and 1395(a); Section 113(b) of CERCLA, 42 U.S.C. § 9613(b); and Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), because the alleged violations in this Complaint occurred and are occurring at the CITGO Lemont Refinery which is located in this District.  Each defendant has consented to venue in this District.

## NOTICE

5.     Notice of the commencement of this action was given to Illinois at least thirty (30) days prior to the filing of this Complaint under Sections 113(a)(1) and 113(b) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (b).

6.     On February 26, 2009, EPA issued a Notice and Finding of Violation ("2009 NOV/FOV") identifying alleged Clean Air Act violations at the Lemont Refinery.  EPA's 2009 NOV/FOV was sent to CITGO and to the State of Illinois.  A copy is attached hereto as Exhibit 1 to this Complaint.

7.     On September 30, 2011, EPA issued a Notice and Finding of Violation ("2011 NOV/FOV") identifying alleged Clean Air Act violations at the Lemont Refinery.  EPA's 2011 NOV/FOV was sent to CITGO and to the State of Illinois.  A copy is attached hereto as Exhibit 2 to this Complaint.

## AUTHORITY

8.     The United States Department of Justice has authority to bring this action on behalf of EPA under, *inter alia*, 28 U.S.C. §§ 516 and 519 and, for the CAA claims, also under Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

## **DEFENDANTS**

9.      Defendant CITGO Petroleum Corporation is a Delaware corporation that is doing business in the State of Illinois.  CITGO Petroleum Corporation is the "operator" of the Lemont Refinery within the meaning of Sections 111(a) and 112(a) of the CAA, 42 U.S.C. §§ 7411(a) and 7412(a).

10.     Defendant PDV Midwest Refining, LLC, is a Delaware limited liability company that is doing business in the State of Illinois.  PDV Midwest Refining, LLC, is the "owner" of the Lemont Refinery within the meaning of Sections 111(a) and 112(a) of the CAA, 42 U.S.C. §§ 7411(a) and 7412(a).

11.     CITGO Petroleum Corporation and PDV Midwest Refining, LLC, each is a "person" within the meaning of Sections 113(b) and 302(e) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(e); Section 103(a) of CERCLA, 42 U.S.C. § 9603(a); Section 329(7) of EPCRA, 42 U.S.C. § 11049(7); and applicable federal and state regulations promulgated pursuant to these statutes.

## **STATUTORY AND REGULATORY BACKGROUND**

## **I.    CLEAN AIR ACT**

12.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

A.    **NATIONAL AMBIENT AIR QUALITY STANDARDS**

1.    **General**

13.    Section 108(a) of the CAA, 42 U.S.C. § 7408(a), requires EPA to list, and issue air quality criteria for, each air pollutant, the emissions of which may endanger public health or welfare and the presence of which results from numerous or diverse mobile or stationary sources.

14.    Section 109(a) of the CAA, 42 U.S.C. § 7409, requires EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS") for those air pollutants for which air quality criteria have been issued pursuant to Section 108 of the CAA.  Under Section 109(b) of the CAA, 42 U.S.C. § 7409(b), the primary NAAQS are to be adequate to protect the public health with an adequate margin of safety, and the secondary NAAQS are to be adequate to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

15.    Pursuant to Sections 108 and 109 of the CAA, 42 U.S.C. §§ 7408 and 7409, EPA has listed and issued air quality criteria and NAAQS for, *inter alia*, sulfur dioxide ("$SO_2$"), carbon monoxide ("CO"), and ozone.  The NAAQS for these pollutants are set forth in 40 C.F.R. Part 50.

16.    Pursuant to Section 107(d) of the CAA, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is deemed an "attainment" area.  An area that does not meet the NAAQS for a particular pollutant is deemed a "non-attainment" area.  An area that cannot be classified due to insufficient data is deemed

"unclassifiable." Air quality designations for states are approved by EPA and can be found at 40 C.F.R. Part 81.

### 2.    State Implementation Plans

17.    Section 110 of the CAA, 42 U.S.C. § 7410, requires each State to adopt and submit to EPA for approval a plan that provides for the attainment and maintenance of the NAAQS in each air quality control region within each state. This plan is known as a State Implementation Plan ("SIP").

18.    Pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, states adopt and submit to EPA for approval various rules for the attainment and maintenance of the NAAQS. After such provisions are approved by EPA, these provisions constitute a state's "applicable implementation plan," within the meaning of Sections 113(b) and 302(q) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(q), and are considered the State Implementation Plan ("SIP"). These SIPs are enforceable by the respective states in which they are adopted and, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), by the United States.

19.    Of relevance to this Complaint, Section 110(a)(2)(C) of the CAA, 42 U.S.C. § 7410(a)(2)(C), requires each State Implementation Plan to include, *inter alia*, "regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter [Subchapter I of the CAA]."

### 3.    Prevention of Significant Deterioration ("PSD") Requirements

#### a.    PSD Program in General

20.    Part C of Subchapter I of the CAA, 42 U.S.C. §§ 7470–7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas

designated as either attainment or unclassifiable for purposes of complying with the NAAQS. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process. 42 U.S.C. § 7470. These provisions are referred to herein as the "PSD program."

21. The core of the PSD program is that "[n]o major emitting facility . . . may be constructed in any [attainment or unclassifiable] area" unless various requirements are met. 42 U.S.C. § 7475(a). These requirements include obtaining a PSD permit with emission limitations that conform to the CAA, demonstrating that emissions will not contribute to a NAAQS violation, and applying "best available control technology" ("BACT") to control emissions. *Id*.

22. Section 169(1) of the CAA, 42 U.S.C. § 7479(1), designates petroleum refineries and chemical process plants which emit or have the potential to emit one hundred tons per year or more of any pollutant to be a "major emitting facility."

23. EPA promulgated regulations to implement the PSD program. These regulations are found at 40 C.F.R. § 52.21 and are referred to as the "PSD regulations."

**b.      PSD Program in Illinois**

24. In addition to the requirement found in Section 110(a)(2)(c) of the CAA, 42 U.S.C. § 7410(a)(2)(C), Section 161 of the CAA, 42 U.S.C. § 7471, also requires that each State Implementation Plan contain a PSD program. A state may comply with Section 161 by having EPA delegate authority to enforce the federal PSD regulations set forth at 40 C.F.R.

§ 52.21, or by having its own PSD regulations approved by EPA as part of its SIP. For an "approved" program, the state requirements must be at least as stringent as the requirements set forth at 40 C.F.R. § 51.166.

25.     Illinois has a delegated PSD program. 40 C.F.R. § 52.738(b) (federal PSD program is incorporated and made part of the Illinois SIP). Illinois is authorized to issue and enforce PSD permits.

<strong>c.      Requirements of the Applicable PSD Regulations</strong>

26.     Under the PSD regulations relevant to the allegations in this Complaint, "[n]o new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section [40 C.F.R. § 52.21] apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements." 40 C.F.R. § 52.21(a)(2)(iii). With certain exceptions not applicable here, the requirements of paragraphs (j) through (r)(5) "apply to the construction of any new major stationary source or the major modification of any existing major stationary source." 50 C.F.R. § 52.21(a)(2)(ii).

27.     "Major modification" is defined as "any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(40) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(50) of this section) and a significant net emissions increase of that pollutant from the major stationary source." 40 C.F.R. § 52.21(b)(2)(i).

28.     "Significant emissions increase" means "for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (b)(23) of this section) for that pollutant." 40 C.F.R. § 52.21(b)(40).

29.    "Regulated NSR Pollutant" means, *inter alia*, nitrogen oxides ("NOx"); sulfur dioxide ("$SO_2$"), particulate matter ("PM"), $PM_{10}$, $PM_{2.5}$, volatile organic compounds ("VOCs"), carbon monoxide ("CO"), hydrogen sulfide ("$H_2S$"), and sulfuric acid mist ("$H_2SO_4$"). 40 C.F.R. § 52.21(b)(50).

30.    "Significant" means the following amounts for the following pollutants:

| | |
|---|---|
| NOx | 40 tons per year ("TPY") |
| $SO_2$ | 40 TPY |
| PM | 25 TPY |
| $PM_{10}$ | 15 TPY |
| $PM_{2.5}$ | 10 TPY of direct $PM_{2.5}$ emissions |
| VOC | 40 TPY |
| CO | 100 TPY |
| $H_2S$ | 10 TPY |
| $H_2SO_4$ | 7 TPY |

40 C.F.R. § 52.21(b)(23).

31.    "Net emissions increase" means "with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero: *(a)* The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(iv) of this section; and *(b)* Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable." 40 C.F.R. § 52.21(b)(3)(i).

32.    If a new major stationary source or major modification triggers the requirements of the PSD Program, the owner and/or operator, *inter alia*, must install and operate the best available control technology ("BACT") (as that term is defined at 42 U.S.C. § 7479(3) and 40 C.F.R. § 52.21(b)(12)) at the facility for each pollutant that will have a significant net emissions increase, conduct air quality modeling, and analyze and demonstrate that the

9

construction or modification, taken together with other increases or decreases of air emissions, will not violate applicable air quality standards. 42 U.S.C. § 7475(a); 40 C.F.R. §§ 52.21(j)–(r)(5).

### 4. NonAttainment New Source Review ("NSR") Requirements

#### a. Nonattainment New Source Review Program in General

33. Part D of Subchapter I of the CAA, 42 U.S.C. §§ 7501-7515, sets forth provisions relating to what are commonly referred to as "New Source Review" requirements applicable to nonattainment areas ("Nonattainment NSR"). The Nonattainment NSR program is intended, *inter alia*, to reduce emissions of air pollutants in areas that have not attained the NAAQS.

34. Part D directs states to include in their SIPs requirements to provide for reasonable progress towards attainment of the NAAQS in nonattainment areas. 42 U.S.C. § 7502(c)(2).

35. Part D at Section 172(c)(5) of the CAA, 42 U.S.C. § 7502(c)(5), describes the core of the Nonattainment NSR Program. Under Section 172(c)(5), all state SIPs must require permits for the construction and operation of new or modified major stationary sources anywhere in a nonattainment area within the state. These Nonattainment NSR permits must be issued in accordance with Section 173 of the CAA, 42 U.S.C. § 7503.

36. EPA has promulgated regulations that prescribe the elements that all state SIPs must include in their Nonattainment NSR permit programs. 40 C.F.R. § 51.165. EPA also has issued an "Interpretative Ruling" that clarifies the requirements necessary for the approval of any permit in a nonattainment area. 40 C.F.R. Part 51, Appendix S, Part IV.

### b.     <u>Nonattainment NSR Program in Illinois</u>

37.     A state may comply with Sections 172 and 173 of the CAA by having its Nonattainment NSR regulations approved by EPA as part of its SIP. These provisions must be at least as stringent as those set forth at 40 C.F.R. § 51.165 and must comply with 40 C.F.R. Part 51, Appendix S, Part IV.

38.     Illinois has an approved Nonattainment NSR permit program. 35 Ill. Admin. Code Part 203. 57 Fed. Reg. 59,928 (Dec. 17, 1992). Illinois is authorized to issue and enforce Nonattainment NSR permits. In all respects relevant to this Complaint, the Nonattainment NSR permit provisions of Illinois that are applicable to this action closely mirror the federal regulations codified at 40 C.F.R. § 51.165 and 40 C.F.R. Part 51, Subpart S, Part IV.

### c.     <u>Requirements of Applicable Nonattainment NSR Programs</u>

39.     Under the Nonattainment NSR requirements relevant to the allegations in this Complaint, no new major stationary source or major modification may be issued a permit to construct unless certain requirements are met. 40 C.F.R. Part 51, Appendix S, Section IV.A.

40.     "Major stationary source" includes, *inter alia*, any stationary source that has the potential to emit 100 TPY or more of any regulated NSR pollutant. 40 C.F.R. § 51.165(a)(1)(iv)(A).

41.     For purposes of this Complaint, "major modification" and the following terms used within that definition—"significant emissions increase," "significant," and "net emissions increase"—have the same meanings as those set forth in Paragraphs 27–28 and 30–31, except that, under the Nonattainment NSR program, there is no "significance" level for $H_2S$. 40 C.F.R. § 51.165(a)(1)(x)(A). $H_2S$ is not a "regulated NSR pollutant" for purposes of the Nonattainment NSR program. 40 C.F.R. § 51.165(a)(1)(xxxvii).

42.     If a new major stationary source or major modification triggers the requirements of the Nonattainment NSR program, the owner and/or operator must obtain a Nonattainment NSR permit that among other things:  (a) secures federally enforceable emission offsets that are at least as great as the new or modified source's emissions; (b) installs and operates the lowest achievable emission rate ("LAER") as defined in Section 171(3) of the CAA, 42 U.S.C. § 7501(3); and (c) analyzes alternative sites, sizes, production processes, and environmental control techniques for the proposed source and demonstrate that the benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.  42 U.S.C. §§ 7503(a)–(c); 40 C.F.R. Part 51, Appendix S, Part IV, Conditions 1–4.

## B.     NEW SOURCE PERFORMANCE STANDARDS

### 1.     General

43.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires EPA to publish and periodically revise a list of categories of stationary sources including those categories that, in EPA's judgment, cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare.

44.     Once a category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. §7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for new sources within the category, also known as a New Source Performance Standard ("NSPS"). Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of an NSPS after the effective date of the NSPS applicable to such source.

45.     "New source" is defined as any stationary source, the construction or modification of which is commenced after the publication of the NSPS regulations or proposed NSPS regulations applicable to such sources.  42 U.S.C. § 7411(a)(2).  "Stationary source" is defined as a building, structure, facility, or installation which emits or may emit any air pollutant. 42 U.S.C. § 7411(a)(3).

46.     The New Source Performance Standards are located in Part 60 of Title 40 of the Code of Federal Regulations.

**2.     Part 60, Subpart A:  General**

47.     Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA promulgated regulations that contain general provisions applicable to all NSPS sources. 40 C.F.R. Part 60, Subpart A, §§ 60.1- 60.19 ("Subpart A").

48.     Under Subpart A, the provisions of 40 C.F.R. Part 60 "apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication [in Part 60] of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility."  40 C.F.R. § 60.1.

49.     "Affected facility" is defined as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

**3.     Part 60, Subpart A:  40 C.F.R. § 60.11(d)**

50.     Within Subpart A, EPA promulgated a regulation that applies at all times to all affected facilities, including associated air pollution control equipment.  Specifically, at all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution

control equipment in a manner consistent with good air pollution control practice for minimizing emissions. 40 C.F.R. § 60.11(d).

### 4. Part 60, Subpart A: 40 C.F.R. ¶ 60.13(e) (Requirements related to Continuous Monitoring Systems)

51. Within Subpart A, EPA promulgated specific regulations that apply to all continuous monitoring systems required under any applicable Subpart. 40 C.F.R. § 60.13.

52. Of relevance to this Complaint, "except for system breakdowns, repairs, calibration checks, and zero and span adjustments required under [another subparagraph of this provision], all continuous monitoring systems shall be in continuous operation." 40 C.F.R. § 60.13(e).

### 5. Part 60, Subpart A: 40 C.F.R. § 60.18 (Requirements related to Flares Used as Control Devices)

53. Within Subpart A, EPA promulgated specific regulations that apply whenever flares are used as control devices. 40 C.F.R. §§ 60.18(b)–(f).

54. Of relevance to this Complaint is the requirement that an owner or operator monitor each flare to ensure that it is operated and maintained in conformance with its design, 40 C.F.R. § 60.18(d).

### 6. Specific NSPS Standards: Part 60, Subparts J, VV, and GGG

55. Pursuant to Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), EPA has identified, *inter alia*, the following as categories of stationary sources that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare and EPA has promulgated regulations in the following Subparts of Part 60 of Title 40 of the Code of Federal Regulations to regulate those categories:

| CATEGORY | REGULATION (40 C.F.R. Part 60) |
|---|---|
| Petroleum Refineries | Subpart J 40 C.F.R. §§ 60.100 *et seq.* |
| Equipment Leaks of VOC in Petroleum Refineries (between Jan. 4, 1983, and Nov. 7, 2006) | Subpart GGG 40 C.F.R. §§ 60.590–60.593 |
| Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry (between Jan. 5, 1981, and Nov. 7, 2006) | Subpart VV 40 C.F.R. §§ 60.480–60.489 |

56.     Of relevance to this Complaint, one of the "affected facilities" that Subpart J applies to is a "fluid catalytic cracking unit catalyst regenerator," 40 C.F.R. § 60.100(a), which commenced construction, reconstruction, or modification after June 11, 1973.

57.     Under Subpart J, an owner or operator of a fluid catalytic cracking unit ("FCCU") catalyst regenerator that is an affected facility is prohibited from discharging into the atmosphere particulate matter in excess of 1.0 kg/Mg of coke burn-off.  40 C.F.R. § 60.102(a)(1).

58.     Under Subpart J, an owner or operator of a fuel gas combustion device (including a flare) that is an affected facility is required to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in the fuel gases before being burned in any fuel gas combustion device.  40 C.F.R. § 60.105(a)(1), (4).

59.     Under Subpart J, an owner or operator of a Claus sulfur recovery plant with oxidation control systems or reduction control systems following by incineration is required to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis, zero percent excess air) of $SO_2$ emission into the atmosphere.  40 C.F.R. § 60.105(a)(1), (5).

60.     Of relevance to this Complaint, the affected facilities that Subpart GGG applies to are compressors and all "equipment" within a process unit at a petroleum refinery.  40 C.F.R.

§ 60.590(a). "Equipment" means each valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector in VOC service. 40 C.F.R. § 60.591.

61. In all respects relevant to this Complaint, each owner or operator of a petroleum refinery that is subject to the requirements of Subpart GGG is required to comply with the standards of Subpart VV. 40 C.F.R. §§ 60.592.

62. Of relevance to this Complaint, the affected facilities that Subpart VV applies to are all "equipment" within a process unit at a synthetic organic chemicals manufacturing facility. 40 C.F.R. §§ 60.480(a)(2). "Equipment" means each pump, compressor, sampling connection system, open-ended valve or line, valve, and flange or other connector in VOC service. 40 C.F.R. §§ 60.481, 60.481a.

63. Under Subpart VV—and therefore, under GGG—each owner or operator who uses a flare as a control device to comply with the requirements of Subpart VV must also comply with the requirements of 40 C.F.R. § 60.18. 40 C.F.R. §§ 60.482-10(d).

64. Under Subparts VV—and therefore, under GGG—each owner or operator of any control device used to comply with the requirements of Subpart VV must monitor the control device to ensure that it is operated and maintained in conformance with its design. 40 C.F.R. §§ 60.482-10(e).

C.     **NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS**

    1.     **General:  Section 112**

65.     Section 112 of the Clean Air Act sets forth a national program for the control of hazardous air pollutants ("HAPs").  42 U.S.C. § 7412.  As originally promulgated in the Clean Air Act Amendments of 1970, Section 112 directed EPA to publish a list of HAPs.  A HAP was defined as "an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness."  42 U.S.C. § 1857c-7 (1971).  At that time, Congress directed EPA to establish HAP standards that provided "an ample margin of safety to protect the public health from such hazardous air pollutant."  *Id.*

66.     Between 1970 and 1990, EPA listed eight substances as hazardous air pollutants and promulgated emission standards for seven of them.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 151 (1990).

67.     Through the Clean Air Act Amendments of 1990, Congress replaced the then-existing Section 112 and established a new program for the control of HAPs.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 324 (1990).

68.     With the 1990 amendments, Congress itself established a list of 188 hazardous air pollutants believed to cause adverse health or environmental effects.  42 U.S.C. § 7412(b)(1).

69.     Congress directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(c).

70.     "Major source" was and is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the

potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or

25 tons per year or more of any combination of HAPs. 42 U.S.C. § 7412(a)(1).

71. "Stationary source" was and is defined as any building, structure, facility, or

installation which emits or may emit any air pollutant. 42 U.S.C. § 7412(a)(3) (stating that

"stationary source" under Section 112(a) has the same meaning as that term has under

Section 111(a) of the CAA, 42 U.S.C. § 7411(a)(3)).

72. A "category" of sources is a group of sources having some common features

suggesting that they should be regulated in the same way and on the same schedule.

57 F.R. 31576, 31578 (July 16, 1992). A single stationary source can be comprised of multiple

source categories. *Id.*

73. Congress directed EPA to promulgate regulations establishing emission standards

for each category or subcategory of, *inter alia*, major sources of HAPs. 42 U.S.C. § 7412(d)(1).

These emission standards must require the maximum degree of reduction in emissions of HAPs

that the Administrator, taking into consideration the cost of achieving such emission reduction,

and any non-air quality health and environmental impacts and energy requirements, determines

is achievable for the new or existing sources in the category or subcategory to which the

emission standard applies. 42 U.S.C. § 7412(d)(2).

74. To the extent that it is not feasible to prescribe or enforce an emission standard for

the control of a HAP, Congress authorized EPA to promulgate "design, equipment, work

practice, or operational" standards, which are to be treated as emission standards.

42 U.S.C. § 7412(h).

75. The emission standards promulgated under Section 112 of the 1990 Amendments

of the CAA, 42 U.S.C. § 7412, are known as the National Emission Standards for Hazardous Air

Pollutants ("NESHAPs") for Source Categories or "MACT" ("maximum achievable control technology") standards. These emission standards are found in Part 63 of Title 40 of the Code of Federal Regulations.

76.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of such standard, limitation, or regulation. 42 U.S.C. § 7412(i)(3).

## 2.     Part 63, Subpart A:  General

77.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, as it existed after the 1990 CAA Amendments, EPA promulgated regulations that contain general provisions applicable to sources that are subject to the MACT standards of Part 63 of Title 40 of the Code of Federal Regulations. 40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16 ("Subpart A").

78.     Under Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or operator of any stationary source that (i) emits or has the potential to emit any hazardous air pollutant listed in or pursuant to section 112(b) of the Act; and (ii) is subject to any standard, limitation, prohibition, or other federally enforceable requirement established pursuant to this part." 40 C.F.R. § 63.1(b).

79.     Under Subpart A, each relevant standard in Part 63 must identify explicitly whether each provision in Subpart A is or is not included in such relevant standard. 40 C.F.R. § 63.1(a)(4)(i).

## 3.     Part 63 Subpart A:  40 C.F.R. § 63.6(e)(1)(i)

80.     Within Subpart A of Part 63, EPA promulgated a requirement that corresponds to the "good air pollution control practices" requirement of Subpart A of the NSPS (*i.e.* 40 C.F.R. § 60.11(d)). Specifically, at all times, including periods of startup, shutdown, and malfunction,

the owner or operator must operate and maintain any affected source, including associated air pollution control equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions. 40 C.F.R. § 63.6(e)(1)(i).

4. **Part 63, Subpart A: 40 C.F.R. § 63.11(b) (Requirements related to Flares Used as Control Devices)**

81. Within Subpart A of Part 63, EPA promulgated specific regulations that apply whenever flares are used as control devices. 40 C.F.R. § 63.11(b).

82. Of relevance to this Complaint is the requirement that an owner or operator monitor a flare to ensure that it is operated and maintained in conformance with its design. 40 C.F.R. § 63.11(b)(1).

5. **Specific MACT Standards: Part 63, Subpart CC**

83. Pursuant to Section 112(c) of the CAA, 42 U.S.C. § 7412(c), EPA identified petroleum refineries as a source category of HAPs. 57 F.R. 31576, 31591 (Table 1) (July 16, 1992).

84. Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries. 60 Fed. Reg. 43260 (August 18, 1995). These standards are commonly referred to as the "Refinery MACT" and are found at 40 C.F.R. Part 63, Subpart CC, §§ 63.640–63.656 and associated Tables.

85. Of relevance to this Complaint, the affected sources that Subpart CC applies to are all "miscellaneous process vents" and "equipment leaks" from petroleum refining process units that are located at a plant site that is a major source and that emit or have equipment containing or contacting one or more of the HAPs listed in a table associated with Subpart CC. 40 C.F.R. §§ 63.640(c)(1), (c)(4).

86.     Under Subpart CC, owners or operators of certain types of process vents must reduce emissions of organic HAPs from these vents by using either: (1) a flare that meets the requirements of 40 C.F.R. § 63.11(b), 40 C.F.R. § 63.643(a)(1); or (2) a different type of control device that reduces organic HAPs by 98 weight percent or to a concentration of 20 ppmv. 40 C.F.R. § 63.643(a)(2).

87.     Under Subpart CC, owners and operators must comply with the equipment leak provisions of Subpart VV, 40 C.F.R. § 63.648(a), which requires compliance with 40 C.F.R. § 60.18.

88.     Pursuant to Table 6 of Subpart CC, with certain exceptions that are not applicable here, owners or operators of affected facilities under Subpart CC are required to comply with 40 C.F.R. §§ 63.6(e) and 63.11(b).

**6.     Specific MACT Standards:  Part 63, Subpart UUU**

89.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), and several years after promulgating Subpart CC, EPA promulgated Subpart UUU:  the "National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries:  Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units."  These standards are commonly referred to as the "Refinery MACT II" standards and are found at 40 C.F.R. Part 63, Subpart UUU, §§ 63.1560–1579 and associated Tables.

90.     Of relevance to this Complaint, the affected source that Subpart UUU applies to are process vents or groups of process vents on catalytic reforming units that are associated with the regeneration of the catalyst used in the unit, 40 C.F.R. § 63.1562(b)(2), if the unit is located at a petroleum refinery that is a major source of HAP emissions. 40 C.F.R. § 63.1561(a).

91.     Under Subpart UUU, owners or operators of process vents on catalytic reforming units that are affected sources have two compliance options for controlling emissions, one of which requires venting emissions to a flare that meets the control device requirements of 40 C.F.R. § 63.11(b).  40 C.F.R. § 63.1566(a)(1)(i).

92.     Pursuant to Table 44 of Subpart UUU, owners and operators of affected facilities under Subpart UUU are required to comply with 40 C.F.R. §§ 63.6(e)(1) and 63.11(b).

### 7.     Specific MACT Standards:  Part 63, Subpart H (part of the HON)

93.     Pursuant to Section 112(c) of the CAA, 42 U.S.C. § 7412(c), EPA identified the synthetic organic chemical manufacturing industry ("SOCMI") as a source category of HAPs. 57 F.R. 31576, 31591 (Table 1) (July 16, 1992).

94.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry.  59 F.R. 19,402 (April 22, 1994).  These standards commonly are referred to as the "Hazardous Organic NESHAP" or the "HON."

95.      The HON consists of four subparts in Part 63 of Title 40 of the Code of Federal Regulations:  Subparts F, G, H, and I.  *Id*. at 19,405.  Of relevance to this Complaint is Subpart H, which sets forth regulations related to equipment leaks.

96.     Pursuant to 40 C.F.R. § 63.166(b), each sampling collection system must be equipped with a closed-purge, closed-loop, or closed-vent system to either (1) return the purged process fluid to the process line; or (2) collect and recycle the purged liquid to a process; or (3) be designed and operated to capture and transport the purged process fluid to a control device; or (4) collect, store, and transport the purged process fluid to a waste management unit, a

treatment, storage, or disposal facility, or a facility that manages municipal or industrial solid waste.

### D.     <u>ILLINOIS SIP</u>

97.    Pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, Illinois adopted and submitted to EPA for approval various rules for the attainment and maintenance of the NAAQS. As part of the federally enforceable Illinois SIP for the Chicago area, EPA approved the following: "No person shall cause or allow the discharge of organic materials in excess of 100 ppm equivalent methane (molecular weight 16.0) into the atmosphere from [various petroleum refining sources]." Ill. Admin. Code tit. 35, § 218.441(a). At the same time, EPA approved a provision that allowed certain sources to comply with this general prohibition by either limiting emissions to eight (8) pounds per hour of organic material or reducing uncontrolled organic emissions to 10 ppm organic material or by 85%. Ill. Admin. Code tit. 35, § 218.441(b) (permitting compliance with Ill. Admin. Code tit. 35, §§ 218.301, 218.302).

### E.     <u>TITLE V</u>

98.    Title V of the Clean Air Act, 42 U.S.C. §§ 7661–7661f, establishes an operating permit program for certain sources, including major sources, sources subject to Sections 111 (NSPS program) or 112 (NESHAP/MACT program) of the CAA, or any source required to have a PSD or Nonattainment NSR Permit. 42 U.S.C. § 7661a(a). The purpose of Title V is to ensure that all "applicable requirements" that a source is subject to under the CAA, including SIP requirements, are collected in one permit. 42 U.S.C. § 7661c(a).

99.    Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of

a Title V permit program to be administered by any state or local air pollution control agency.

57 Fed. Reg. 32250 (July 21, 1992). These regulations are codified at 40 C.F.R. Part 70.

100. Illinois has an EPA-approved Title V program found 415 Ill. Comp. Statutes

5/39.5. 60 Fed. Reg. 12,478 (interim approval, March 7, 1995); 66 Fed. Reg. 62,946 (full

approval, Nov. 30, 2001). Illinois is authorized to issue and enforce Title V permits. In all

respects relevant to this Complaint, the Title V regulations of Illinois closely mirror the federal

Title V regulations codified at 40 C.F.R. Part 70.

101. Section 502(a) of the CAA (42 U.S.C. § 7661a(a)) and the Title V permit program

and regulations of Illinois provide that, after the effective date of the state Title V permit

program, no person may violate any requirement of a Title V permit.

102. Section 502(a) of the CAA (42 U.S.C. § 7661a(a)), the implementing regulations

at 40 C.F.R. §§ 70.1(b) and 70.7(b), and the Title V permit program and regulations of Illinois

provide that, after the effective date of the state Title V permit program, no source subject to

Title V may operate except in compliance with a Title V permit.

103. Section 503(c) of the CAA (42 U.S.C. § 7661b(c)), the implementing regulations

at 40 C.F.R. § 70.5(a), and the Title V permit program and regulations of Illinois provide that

each owner and operator of a source subject to Title V permitting requirements must submit a

permit application. Among other things, the permit application must contain: (i) information

sufficient to determine all applicable air pollution control requirements (including any

requirement to meet the applicable control technology requirements under the PSD and

Nonattainment NSR programs and to comply with the applicable NSPS and/or NESHAP/MACT

standards), 40 C.F.R. § 70.5(c)(4); (ii) information that may be necessary to determine the

applicability of other applicable requirements of the CAA, 40 C.F.R. § 70.5(c)(5); (iii) a

compliance plan for all applicable requirements for which the source is not in compliance, 42 U.S.C. § 7661b(b), 40 C.F.R. § 70.5(c)(8); and (iv) a certification of compliance with all applicable requirements by a responsible official. 40 C.F.R. § 70.5(c)(9).

104.    Under 40 C.F.R. § 70.5(b) and the Title V permit program and regulations of Illinois, any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.

105.    Section 504(a) of the CAA (42 U.S.C. § 7661c(a)), the implementing regulations at 40 C.F.R. § 70.6(a) and (c), and the Title V permit programs and regulations of Illinois requires each Title V permit to include, *inter alia*, enforceable emission limitations and standards, a schedule of compliance, and such other conditions as are necessary to assure compliance with all applicable requirements of the CAA, including the requirements of the applicable SIP.

106.    All terms and conditions of a Title V permit are enforceable by EPA. 42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

### F.    ENFORCEMENT OF THE CAA

107.    Sections 113(a)(1) and (a)(3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize EPA to bring a civil action under Section 113(b) if EPA finds that any person is in violation of any requirement or prohibition of a SIP, the PSD and Nonattainment NSR permit programs, a PSD or Nonattainment NSR permit, the NSPS program, the NESHAP/MACT program, the Title V permit program, or a Title V permit.

108.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

109.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA.

110.     The Civil Penalties Inflation Act of 1990, 28 U.S.C. § 2461 *et seq*., as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 *et seq*., requires EPA to periodically adjust its civil penalties for inflation.  On December 31, 1996, February 13, 2004, and December 11, 2008, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CAA.  For each violation that occurs between January 31, 1997, and March 15, 2004, inclusive, penalties of up to $27,500 per day may be assessed; for each violation that occurs between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $32,500 per day may be assessed; and for each violation that occurs on and after January 13, 2009, penalties of up to $37,500 per day may be assessed.  60 Fed. Reg. 69,360 (Dec. 31, 1996); 60 Fed. Reg. 7121 (Feb. 12, 2004); 73 F.R. 75,340 (Dec. 11, 2008).

II.     **COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT ("CERCLA") AND EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT ("EPCRA")**

A.     **CERCLA Emergency Notification Requirements**

111.     Section 102(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9602(a), requires the Administrator of EPA to publish a list of substances designated as hazardous substances which when released into the environment may present substantial danger to public health or welfare or the environment, and

to promulgate regulations establishing that quantity of any hazardous substance, the release of which shall be required to be reported under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a) ("Reportable Quantity" or "RQ"). The list of RQs of hazardous substances is codified at 40 C.F.R. Part 302.

112.    Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), as implemented by 40 C.F.R. Part 302, requires, in relevant part, that a person in charge of an onshore facility, as soon as he/she has knowledge of a release (other than a federally permitted release) of a hazardous substance from such facility in quantities equal to or greater than the RQ to immediately notify the National Response Center ("NRC") established under the Section 311(d)(2)(E) of the CWA, 33 U.S.C. § 1321(d)(2)(E), of such release.

113.    "Onshore facility," under Section 101 of CERCLA, 42 U.S.C. § 9601, is defined as any facility of any kind located in, on, or under, any land or nonnavigable waters within the United States.  42 U.S.C. § 9601(18).

114.    Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), provides that any person who violates the notice requirements of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), shall be liable to the United States for civil penalties.

**B.    EPCRA Emergency Notification Requirements**

115.    The Emergency Planning and Community Right-to-Know Act ("EPCRA") was enacted on October 17, 1986, as Title III of the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 (1986) (codified at 42 U.S.C. §§ 11001–11050).

116.    The purpose of EPCRA was and is to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency

planning efforts to control any accidental releases. Emergency Planning and Community Right-to-Know Programs, Interim Final Rule, 51 Fed. Reg. 41,570 (1986).

117.     To achieve this end, EPCRA mandates that state emergency response commissions ("SERCs") and local emergency planning committees ("LEPCs") be created. 42 U.S.C. § 11001(a) and (c). EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of a health-threatening release. 42 U.S.C. § 11001. EPCRA further mandates that industrial and commercial facilities, at which a hazardous chemical is produced, used, or stored, notify SERCs and LEPCs when they have releases of extremely hazardous substances and hazardous substances. 42 U.S.C. § 11004.

118.     Sections 304(a) and (b) of EPCRA, 42 U.S.C. §§ 11004(a) and (b), requires the owner and operator of a facility at which a hazardous chemical is produced, used, or stored, to immediately notify the SERC and LEPC of certain specified releases of a hazardous or extremely hazardous substance.

119.     Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and 40 C.F.R. § 355.20 define "facility" to mean, in relevant part, all buildings, equipment, structures, and other stationary items which are located on a single site and that are owned or operated by the same person.

120.     Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), provides that any person who violates the notice requirements of Section 304 of EPCRA, 42 U.S.C. § 11004, shall be liable to the United States for civil penalties.

**C.     Federal Enforcement of CERCLA and EPCRA Emergency Notification Requirements**

121.     Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), and Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), authorize EPA to assess a civil penalty of up to $25,000 per

day of violation, and in the case of a second or subsequent violation, $75,000 per day of violation of CERCLA Section 103, 42 U.S.C. § 9603, or of EPCRA Section 304, 42 U.S.C. § 11004. The Debt Collection Improvement Act, 31 U.S.C. § 3701 *et seq.*, requires EPA to periodically adjust its civil penalties for inflation. On December 31, 1996, February 13, 2004, and December 11, 2008, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under CERCLA and EPCRA. For each violation that occurs between January 31, 1997, and March 15, 2004, inclusive, penalties of up to $27,500 per day may be assessed; for each violation that occurs between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $32,500 per day may be assessed; and for each violation that occurs on and after January 13, 2009, penalties of up to $37,500 per day may be assessed. Additionally, in the case of a second or subsequent violation, for each violation that occurs between January 31, 1997, and March 15, 2004, inclusive, penalties of up to $82,500 per day may be assessed; for each violation that occurs between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $97,500 per day may be assessed; for each violation that occurs between January 13, 2009, and December 6, 2013, penalties of up to $107,500 per day may be assessed; and for each violation that occurs on or after December 7, 2013, penalties of $117,500 per day may be assessed. 61 Fed. Reg. 69,360 (Dec. 31, 1996); 69 Fed. Reg. 7121 (Feb. 12, 2004); 73 Fed. Reg. 75,340 (Dec. 11, 2008); 78 Fed. Reg. 66,648 (Nov. 6, 2013).

## CLEAN AIR ACT CLAIMS:  1–13

### General Allegations

122.    CITGO is the "owner or operator," within the meaning of the CAA, of the Lemont Refinery.

123.    The Lemont Refinery is a "major emitting facility," a "source," a "stationary source," a "major stationary source," and a "major source" within the meaning of the CAA, the New Source Review permit programs and regulations (including the PSD and Nonattainment NSR programs), the NSPS program and regulations, the NESHAP/MACT program and regulations, the Title V program and regulations, and the Illinois SIP that adopts, incorporates, and/or implements these programs and regulations.

124.    The Lemont Refinery has a Title V permit that has been issued by State of Illinois.

125.    The Lemont Refinery owns and operates, *inter alia*, the following units at the Lemont Refinery:  a fluidized catalyst cracking unit ("FCCU"); sulfur recovery plants ("SRPs"); and various heaters and boilers that constitute fuel gas combustion devices.

126.    The Lemont Refinery owns and operates five steam-assisted flares identified as C1, C2, C3, C4, and C5.

127.    A flare is a combustion device that uses an uncontrolled volume of ambient air to burn gases.

128.    A steam-assisted flare is a flare that utilizes steam piped to the flare tip to assist in combustion.

## CLEAN AIR ACT
## CLAIM 1
### Violation of PSD, Nonattainment NSR Requirements, and Illinois SIP Requirements Regarding CITGO's Ultra Low Sulfur Diesel Project

### Failure to Apply for, Obtain, and Operate Pursuant to
### PSD and/or Nonattainment NSR Permits

129.    Plaintiff realleges and incorporates by reference Paragraphs 1–128 as if fully set forth herein.

130.    In approximately 2010, CITGO commenced construction at the Lemont Refinery of a "major modification," as defined in the CAA and the Illinois SIP, known as the Ultra Low Sulfur Diesel ("ULSD") Project.  The modifications involved physical changes or changes in the methods of operation at air emissions sources within the Lemont Refinery, including without limitation, the construction of two new heaters identified as 590H-1 and 590H-2.

131.    At the time of the modifications identified in Paragraph 130, the Lemont Refinery was located in an area designated as nonattainment for the annual $PM_{2.5}$ NAAQS.

132.    The modifications identified in Paragraph 130 resulted in significant emissions increases of NOx, $PM_{10}$, and $PM_{2.5}$ and a significant net emissions increase of these pollutants from the Lemont Refinery.

133.    In its application for a permit for the modifications identified in Paragraph 130, CITGO improperly undertook a netting analysis and claimed that the ULSD Project did not result in a significant net emissions increase of NOx, $PM_{10}$ or $PM_{2.5}$.

134.    By failing to apply for, obtain, and operate pursuant to a PSD permit for NOx and $PM_{10}$, CITGO failed to:  (i) undergo a proper BACT determination for NOx and $PM_{10}$; (ii) install and operate BACT on the modified units for the control of NOx and $PM_{10}$; (iii) demonstrate that the emissions increases from the modifications would not cause or contribute to violations of air

quality standards; (iv) provide for review and public comment on the air quality impacts of the modifications; and (v) otherwise comply with the requirements of the PSD program and the SIP of Illinois.

135. By failing to apply for, obtain, and operate pursuant to a Nonattainment NSR permit for $PM_{2.5}$, CITGO failed to: (i) undergo a proper LAER determination for $PM_{2.5}$; (ii) install and operate LAER on the modified units for the control of $PM_{2.5}$; (iii) secure emissions reductions (offsets) from existing sources in the same area where the Lemont Refinery is located such that there would be reasonable progress toward attainment of the applicable NAAQS; and (iv) otherwise comply with the requirements of the Nonattainment NSR program and the Illinois SIP.

136. The acts and/or omissions identified in this Claim constitute violations of:

    (a)    42 U.S.C. § 7475;

    (b)    40 C.F.R. §§ 52.21(a)(2)(iii) and 52.21(j)–52.21(r)(5);

    (c)    42 U.S.C. §§ 7502(c)(5), 7503(a)–(c);

    (d)    40 C.F.R. Part 51, Appendix S, Part IV, Conditions 1–4; and

    (e)    The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(d).

137. Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

138. For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to

$32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to

$37,500 per day for each violation after January 12, 2009.

**CLEAN AIR ACT**
**CLAIM 2**
**Violation of PSD and Illinois SIP Requirements**
**Regarding CITGO's FCCU Operation**

**Failure to Apply for, Obtain, and Operate Pursuant to a**
**<u>PSD Permit</u>**

139.    Plaintiff realleges and incorporates by reference Paragraphs 1–138 as if fully set

forth herein.

140.    On or about 2006, CITGO installed a wet gas scrubber and wet electrostatic

precipitator ("WESP") on the Lemont Refinery's FCCU in order to control emissions of, *inter*

*alia*, PM and sulfuric acid mist ("$H_2SO_4$").

141.    From approximately November 2008 through approximately October 2010,

CITGO shut down the WESP.

142.    The shutdown of the WESP identified in Paragraph 141 was a change in the

method of operation of the FCCU that constituted a "major modification" as defined in the CAA

and the Illinois SIP.

143.    The modification identified in Paragraph 141 resulted in significant emissions

increases of PM and $H_2SO_4$ and a significant net emissions increase of these pollutants from the

Lemont Refinery.

144.    CITGO did not apply for, obtain, or operate pursuant to a PSD permit for this

modification.

145.    By failing to apply for, obtain, and operate pursuant to a PSD permit for PM and

$H_2SO_4$, CITGO failed to:  (i) undergo a proper BACT determination for PM and $H_2SO_4$;

(ii) install and operate BACT on the FCCU for the control of PM and $H_2SO_4$; (iii) demonstrate that the emissions increases from the modification would not cause or contribute to violations of air quality standards; (iv) provide for review and public comment on the air quality impacts of the modification; and (v) otherwise comply with the requirements of the PSD program and the SIP of Illinois.

146.    The acts and/or omissions identified in this Claim constitute violations of:

(a)    42 U.S.C. § 7475;

(b)    40 C.F.R. §§ 52.21(a)(2)(iii) and 52.21(j)–52.21(r)(5); and

(c)    The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(b).

147.    Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

148.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

**CLEAN AIR ACT**
**CLAIM 3**
**Violation of PSD, Nonattainment NSR, and Illinois SIP Requirements**
**Regarding CITGO's Flares**

**Failure to Apply for, Obtain, and Operate Pursuant to**
**PSD and/or Nonattainment NSR Permits**

149.    Plaintiff realleges and incorporates by reference Paragraphs 1–148 as if fully set forth herein.

150.    Upon information and belief, at various times from 2006 to the present, CITGO has commenced construction of a "major modification," as defined in the CAA and the Illinois SIP, at the Lemont Refinery.  The modifications involved physical changes in or changes in the methods of operation of the flare systems of the Lemont Refinery, including physical changes in or changes in the methods of operation of the flare subheaders within process units, flare headers, flare stacks, and flare tips.

151.    Upon information and belief, these modifications resulted in a significant emissions increases of sulfur dioxide ("$SO_2$"), hydrogen sulfide ("$H_2S$"), volatile organic compounds ("VOCs"), and carbon monoxide ("CO") and a significant net emissions increase of these pollutants from the Lemont Refinery flares.

152.    CITGO did not apply for, obtain, or operate pursuant to either a PSD or a Nonattainment NSR permit, as applicable, for any of these modifications.

153.    By failing to apply for, obtain, and operate pursuant to a PSD permit (for those pollutants where Lemont, Illinois, is either in attainment or unclassifiable), CITGO failed to: (i) undergo a proper BACT determination for $SO_2$, $H_2S$, VOCs, and CO for the flare systems for each flare in connection with each major modification; (ii) install and operate BACT on the flare systems of each flare for the control of $SO_2$, $H_2S$, VOCs, and CO; (iii) demonstrate that the

emissions increases from the modifications would not cause or contribute to violations of air quality standards; (iv) provide for review and public comment on the air quality impacts of the modifications; and (v) otherwise comply with the requirements of the PSD program and the Illinois SIP.

154. By failing to apply for, obtain, and operate pursuant to a Nonattainment NSR permit (for those pollutants where Lemont, Illinois, is in nonattainment), CITGO failed to: (i) undergo a proper LAER determination for $SO_2$, VOCs, and CO for the flare systems for each flare in connection with each major modification; (ii) install and operate LAER on the flare systems of each flare for the control of $SO_2$, VOCs, and CO; (iii) secure emissions reductions (offsets) from existing sources in the same area where the Lemont Refinery is located such that there would be reasonable progress toward attainment of the applicable NAAQS; and (iv) otherwise comply with the requirements of the Nonattainment NSR program and the Illinois SIP.

155. The acts and/or omissions identified in this Claim constitute violations of:

    (a)    42 U.S.C. § 7475;

    (b)    40 C.F.R. §§ 52.21(a)(2)(iii) and 52.21(j)–52.21(r)(5);

    (c)    42 U.S.C. §§ 7502(c)(5), 7503(a)–(c);

    (d)    40 C.F.R. Part 51, Appendix S, Part IV, Conditions 1–4; and

    (e)    The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(d).

156. Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

157. For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

**CLEAN AIR ACT
CLAIM 4
Violation of Title V and Illinois SIP Requirements
Relating to PSD and Nonattainment NSR**

**Failure to Submit Timely and Complete Title V Permit Applications and/or
Supplement and Correct Previously Submitted Title V Permit Applications
To Incorporate PSD and/or Nonattainment NSR Requirements;
Operation without Valid Title V Permits Incorporating
PSD and/or Nonattainment NSR Requirements**

158. Plaintiff realleges and incorporates by reference Paragraphs 1–157 as if fully set forth herein.

159. As alleged in Claims 1 and 2 and as alleged upon information and belief in Claim 3, CITGO undertook activities constituting major modifications at the Lemont Refinery. These activities triggered requirements, *inter alia*, to obtain PSD and/or Nonattainment NSR permits establishing emissions limitations that meet BACT and/or LAER, to operate in compliance with BACT and/or LAER, and to otherwise comply with the requirements of the PSD and/or Nonattainment NSR permit programs.

160. CITGO failed to submit complete and timely applications for Title V operating permits at the Lemont Refinery that included, *inter alia,* enforceable BACT and/or LAER limits, identified all applicable requirements, accurately certified compliance with such requirements,

and contained a compliance plan for all applicable requirements for which the Lemont Refinery was not in compliance.

161.    CITGO continued and continues to operate the Lemont Refinery without having valid Title V operating permits that require compliance with BACT and/or LAER or contain a compliance plan for coming into compliance with BACT and/or LAER.

162.    The acts and/or omissions identified in this Claim constitute violations of:

   (a)    Title V of the CAA at 42 U.S.C. §§ 7661a(a), 7661b(c), 7661c(a);

   (b)    Title V implementing regulations at 40 C.F.R. §§ 70.1(b), 70.5(a) and (b), 70.6(a) and (c), and 70.7(b); and

   (c)    The federally enforceable Illinois Title V program to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs 155(a) and (b).

163.    Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

164.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

## CLEAN AIR ACT
## CLAIM 5
### Violation of NSPS Subpart A Requirement related to FCCU Catalyst Regenerators; Violation of Title V Permit and Illinois SIP that Incorporates this Requirement

### Failure to Operate the FCCU Catalyst Regenerator in a Manner Consistent with <u>Good Air Pollution Control Practices</u>

165.    Plaintiff realleges and incorporates by reference Paragraphs 1–164 as if fully set forth herein.

166.    CITGO is the owner and operator of an FCCU catalyst regenerator at the Lemont Refinery.  The FCCU catalyst regenerator is an "affected facility" within the meaning of 40 C.F.R. §§ 60.2 and 60.100(a), and therefore is subject to: (i) the General Provisions of the NSPS found at Subpart A; (ii) NSPS Subpart J (40 C.F.R. §§ 60.100–109); and (iii) the requirements in the Lemont Refinery's Title V permit that compel compliance with the NSPS Subparts A and J.

167.    Under 40 C.F.R. § 60.11(d) (found in NSPS Subpart A), CITGO was and is required, at all times, including periods of startup, shutdown, and malfunction, to the extent practicable, to maintain and operate its FCCU catalyst regenerator in a manner consistent with good air pollution control practices for minimizing emissions.

168.    CITGO's shutdown of the Wet Electrostatic Precipitator on the FCCU catalyst regenerator from approximately November 2008 through October 2010 violated the requirements to operate the FCCU catalyst regenerator in a manner consistent with good air pollution control practices for minimizing emissions.

169.    The acts and/or omissions identified in this Claim constitute violations of:

(a)    Section 111 of the CAA, 42 U.S.C. § 7411;

(b)    Section 111's implementing regulation at 40 C.F.R. § 60.11(d);

(c)    Those provisions of the Refinery's Title V Permit that require compliance with 40 C.F.R. § 60.11(d);

(d)     The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(e)     The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(d).

170.     For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

## CLEAN AIR ACT
### CLAIM 6
**Violation of NSPS Subpart J Requirement related to FCCU Catalyst Regenerators; Violation of Title V Permit and Illinois SIP that Incorporate this Requirement**

**Failure to Comply with PM Emission Limits at the FCCU Catalyst Regenerator**

171.     Plaintiff realleges and incorporates by reference Paragraphs 1–170 as if fully set forth herein.

172.     Under 40 C.F.R. § 60.102(a)(1) (found in NSPS Subpart J), CITGO was prohibited from discharging into the atmosphere from its FCCU catalyst regenerator PM in excess of 1.0 kg/Mg of coke burn-off on a 3-hour average.

173.     From approximately June 30, 2010, through September 2010, CITGO discharged PM in excess of the limit at 40 C.F.R. § 60.102(a)(1).

174.     The acts and/or omissions identified in this Claim constitute violations of:

(a)     Section 111 of the CAA, 42 U.S.C. § 7411;

(b)     Section 111's implementing regulation at 40 C.F.R. § 60.102(a)(1);

(c)     Those provisions of the Refinery's Title V Permit that require compliance with 40 C.F.R. § 60.102(a)(1);

(d)     The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(e)     The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(d).

175.     For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

## CLEAN AIR ACT
## CLAIM 7
### Violation of NSPS Subparts A and J Requirements related to CEMS;
### Violation of Title V Permit and Illinois SIP that Incorporates these Requirements

### Failure to Continuously Operate CEMS

176.     Plaintiff realleges and incorporates by reference Paragraphs 1–175 as if fully set forth herein.

177.     CITGO is the owner and operator of continuous emissions monitoring systems ("CEMS") on various process units at the Lemont Refinery that are subject to the requirements of the NSPS at Subparts A and J.

178.     On numerous occasions between 2005 and 2009, CITGO failed to comply with the requirement to continuously operate the CEMS on the following units, except for periods of system breakdowns, repairs, calibration checks, and zero and span adjustments:  (1) sulfur recovery train 121C; (2) sulfur recovery train 121D; (3) fuel gas combustion devices numbered 114, and 116, associated with the Crude Unit #2 and the light distillate hydrotreater,

respectively; and (4) fuel gas combustion devices numbered 115 and 125, associated with the naphtha desulfurizer and the diesel distillate hydrotreater, respectively.

179.　The acts and/or omissions identified in this Claim constitute violations of:

(a)　Section 111 of the CAA, 42 U.S.C. § 7411;

(b)　Section 111's implementing regulation at 40 C.F.R. §§ 60.13(e), 60.105(a)(1), (a)(4), and (a)(5);

(c)　Those provisions of the Refinery's Title V Permit that require compliance with 40 C.F.R. §§ 60.13(e), 60.105(a)(1), (a)(4), and (a)(5);

(d)　The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(e)　The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(d).

180.　For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

## CLEAN AIR ACT
## CLAIM 8
### Violation of NSPS Subpart J Monitoring Requirement;
### Violation of Title V Permit and Illinois SEP that Incorporate this Requirement

### Failure to Install, Calibrate, Operate, and Maintain H$_2$S
### Continuous Emissions Monitoring Systems on Flares

181.　Plaintiff realleges and incorporates by reference Paragraphs 1–180 as if fully set forth herein.

182.　CITGO is the owner and operator of five steam-assisted flares.  Each of CITGO's five flares is an "affected facility" within the meaning of 40 C.F.R. §§ 60.2 and 60.100(a), and

13

therefore is subject to: (i) the General Provisions of the NSPS found at Subpart A; (ii) NSPS Subpart J (40 C.F.R. §§ 60.100–109); and (iii) the requirements in the Lemont Refinery's Title V permit that compel compliance with the NSPS Subparts A and J.

183. From 2006 to the present, at one or more of the Lemont Refinery flares, CITGO failed to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in the fuel gases before burning the fuel gas in the Refinery Flare.

184. The acts and/or omissions identified in this Claim constitute violations of:

(a) Section 111 of the CAA, 42 U.S.C. § 7411;

(b) Section 111's implementing regulation at 40 C.F.R. § 60.105(a)(4);

(c) Those provisions of the Lemont Refinery's Title V Permit that require compliance with 40 C.F.R. § 60.105(a)(4);

(d) The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(e) The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(d).

185. Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

186. For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

**CLEAN AIR ACT**
**CLAIM 9**
**Violation of NSPS Subpart A Requirement related to Flares;**
**Violation of Title V Permit and Illinois SIP that Incorporates this Requirement**

**Failure to Operate Flares in a Manner Consistent with**
**Good Air Pollution Control Practices**

187.     Plaintiff realleges and incorporates by reference Paragraphs 1–186 as if fully set forth herein.

188.     Under 40 C.F.R. § 60.11(d) (found in Subpart A), CITGO was and is required, at all times, including periods of startup, shutdown, and malfunction, to the extent practicable, to maintain and operate its flares in a manner consistent with good air pollution control practice for minimizing emissions.

189.     Good air pollution control practices for minimizing emissions at flares involve, *inter alia*, combusting essentially all molecules of hydrogen sulfide, hydrocarbons, and hazardous air pollutants ("HAPs") in the gases sent to the flares by ensuring that they have sufficient heating value and oxygen to allow for complete combustion.  For steam-assisted flares (all of CITGO's flares are steam-assisted), good air pollution control practices for minimizing emissions also involve, *inter alia*, injecting steam at a rate that maximizes flame stability and flare combustion efficiency.

190.     In order to ensure that the gases sent to flares have sufficient heating value to ensure complete combustion, good air pollution control practices for minimizing emissions at flares involve, *inter alia*, monitoring, measuring, and/or calculating the net heating value ("NHV") of the gases in the combustion zone ("Combustion Zone Gas") of a flare.  In addition, supplemental gas must be immediately available for addition to the gas being sent to the flare

(the "Vent Gas") to ensure that the NHV of the Combustion Zone Gas is maintained at a level that ensures adequate flare combustion efficiency.

191.     In order to inject steam at a proper rate, good air pollution control practices for minimizing emissions at steam-assisted flares involve, *inter alia*, monitoring the Vent Gas flow rate and steam flow rate to the flare, calculating the ratio of the Vent Gas flow rate to the steam flow rate ("S/VG"), and having sufficient controls on the steam flow rate to enable increasing or decreasing it in order to optimize S/VG to minimize emissions.

192.     On numerous occasions from at least 2004 through 2007, CITGO operated its C1, C4, and C5 flares with an excessively high S/VG.  This excessively high S/VG increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in emissions of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.  These failures continued for some time past 2007.

193.     On information and belief, on numerous occasions from at least 2004 through 2007, CITGO operated its C1, C4, and C5 flares without sufficient Net Heating Value in the Combustion Zone Gas.  This insufficient NHV reduced flare combustion efficiency and resulted in emissions to the atmosphere of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.  On information and belief, these failures continued for some time past 2007.

194.     From at least 2004 through 2007, CITGO failed to install, or failed to utilize properly, Vent Gas flow monitors and steam flow monitors at its C1, C4, and C5 flares; failed to calculate S/VG at its C1, C4, and C5 flares; and failed to have sufficient controls on steam flow to maintain an S/VG that minimized emissions at its C1, C4, and C5 flares.  These failures continued for some time past 2007.

195. From at least 2004 through 2007, CITGO failed to have, or failed to utilize, any equipment or monitoring system at its flares to enable CITGO to calculate the NHV in the Combustion Zone Gas of its C1, C4, and C5 flares. In addition, CITGO failed to have supplemental gas immediately available for addition to the Vent Gas. These failures continued for some time past 2007.

196. CITGO's operation of its C1, C4, and C5 flares with an insufficient NHV in the Combustion Zone Gas, without monitoring the NHV in the Combustion Zone Gas, without supplemental gas immediately available, with excessively high Steam-to-Vent-Gas ratios, without any (or without sufficient) monitors to measure and calculate S/VG, and without sufficient controls on its steam to optimize the steam injection rate violated the requirement to operate the flares in a manner consistent with good air pollution control practices for minimizing emissions.

197. The acts and omissions identified in this Claim constitute violations of:

(a) Section 111 of the CAA, 42 U.S.C. § 7411;

(b) Section 111's implementing regulations at 40 C.F.R. § 60.11(d);

(c) Those provisions of Lemont Refinery's Title V Permit that require compliance with the statutory and regulatory requirements identified in Subparagraphs (a)–(b);

(d) The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(e) The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(d).

198. Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

199.     For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

### CLEAN AIR ACT
### CLAIM 10
#### Violation of an NSPS Subpart A Requirement related to Flares;
#### Violation of Title V Permit and Illinois SIP that Incorporate this Requirement

#### Failure to Monitor Flares to Ensure that They Are Operated and Maintained in Conformance with their Design

200.     Plaintiff realleges and incorporates by reference Paragraphs 1–199 as if fully set forth herein.

201.     CITGO's C1, C4, and C5 flares each is subject to the requirements of 40 C.F.R. § 60.18(d).  Under this provision, CITGO was and is required to monitor each flare to ensure that it is operated and maintained in conformance with its design.  Flares are designed, in part, to achieve high combustion efficiency of VOCs.

202.     As part of its design, a steam-assisted flare must be operated within a range of Steam-to-Vent-Gas ratios that, on the one hand, avoids smoking through an insufficient S/VG, and, on the other hand, avoids excessive S/VG.  Both insufficient and excessive S/VG reduce VOC combustion efficiency below a flare's designed efficiency.

203.     In order to operate a steam-assisted flare in conformance with its design, the Vent Gas flow to the flare must be monitored; the steam flow to the flare must be monitored; the ratio of the Vent Gas flow to steam flow must be calculated; and the steam flow must be subject to

sufficient control to enable increasing or decreasing it in order to maintain a design-appropriate S/VG and a high VOC combustion efficiency consistent with design parameters.

204. From at least 2004 to 2007, for the C1, C4, and C5 flares, CITGO failed to install and/or properly operate Vent Gas flow monitors and steam flow monitors; failed to calculate Steam-to-Vent-Gas ratios; and failed to have sufficient controls on steam flow to maintain Steam-to-Vent-Gas ratios within design parameters.

205. The acts and omissions identified in this Claim constitute violations of:

(a) Section 111 of the CAA, 42 U.S.C. § 7411;

(b) Section 111's implementing regulations at 40 C.F.R. § 60.18(d);

(c) Section 111's implementing regulations at 40 C.F.R. §§ 60.592(a), 60.482-10(d), and 60.482-10(e) (relevant provisions of NSPS's Subparts GGG and VV) insofar as they relate to flares and require compliance with 40 C.F.R. § 60.18(d);

(d) Those provisions of Lemont Refinery's Title V Permit that requires compliance with the statutory and regulatory requirements identified in Subparagraphs (a)–(c);

(e) The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(f) The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(e).

206. Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

207. For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to

$32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to

$37,500 per day for each violation after January 12, 2009.

**CLEAN AIR ACT**
**CLAIM 11**
**Illinois SIP**

**Violation of Illinois SIP Requirement Caused by Insufficient Heating Value in**
**Combustion Zone Gas and Oversteaming of Flares**

208.    Plaintiff realleges and incorporates by reference Paragraphs 1–207 as if fully set

forth herein.

209.    At various times from 2004 to the present, CITGO operated the C1, C4, and C5

flares with an excessively high steam-to-Vent Gas ratio and, on information and belief, with an

insufficient NHV in the Combustion Zone Gas.  This operation increased the likelihood of flame

quenching, reduced flare combustion efficiency, and resulted in emissions to the atmosphere of

uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons

(including VOCs), and carbon monoxide.  On information and belief, this operation caused the

discharge of organic materials in excess of 100 ppm equivalent methane (molecular weight 16.0)

into the atmosphere and these emissions were not either:  (i) limited to eight (8) pounds per hour

of organic material; or (ii) reduced by 85%.

210.    The acts and omissions identified in this Claim constitute violations of Ill. Admin.

Code tit. 35, §§ 218.441(a); those provisions of the Lemont Refinery's Title V permit that

require compliance with the SIP provision identified in this Claim; the prohibitions against

violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R.

§ 70.7(b); and the provisions found in the federally enforceable Illinois Title V program that

correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

211.    Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

212.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

**CLEAN AIR ACT**
**CLAIM 12**
**Violation of a NESHAP HON Requirement related to Benzene;**
**Violation of Title V Permit and Illinois SIP that Incorporate this Requirement**

<u>**Failure to Properly Control Emissions of the Purged Liquid from Benzene Sampling**</u>

213.    Plaintiff realleges and incorporates by reference Paragraphs 1–212 as if fully set forth herein.

214.    CITGO is the owner and operator of a processing unit at the Lemont Refinery known as the UDEX unit and identified as Unit No. 122.

215.    The UDEX unit is subject to the equipment leak requirements of the HON, 40 C.F.R. Part 63, Subpart H.

216.    At all times relevant to this Claim, CITGO followed a procedure whenever it took a benzene sample. It first purged some of the benzene-containing liquid into a container before drawing the liquid that would be analyzed for benzene. It then transferred the purged liquid into another container. After collecting sufficient liquid to fill this second container, CITGO transferred the liquid to a vacuum truck. The vacuum truck did not contain any benzene waste controls. On at least one occasion, EPA utilized a detector that showed that benzene was being

50

emitted from the vacuum truck's vacuum pump exhaust. On information and belief, benzene routinely was being emitted from the vacuum truck's vacuum pump exhaust each time the benzene-containing liquid was transferred to the vacuum truck.

217. The acts and omissions identified in this Claim constitute violations of:

(a)     Section 112 of the CAA, 42 U.S.C. § 7412;

(b)     Section 112's implementing regulations at 40 C.F.R. § 63.166(b);

(c)     Those provisions of Lemont Refinery's Title V Permit that require compliance with the statutory and regulatory requirements identified in Subparagraphs (a)–(b);

(d)     The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(e)     The federally enforceable Illinois SIP to the extent that it adopts, incorporates, and/or implements any of the federal provisions cited in Subparagraphs (a)–(d).

218. Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

219. For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

**CLEAN AIR ACT**
**CLAIM 13**
**Violation of NSPS Subpart GGG Requirements Related to Equipment Leaks;**
**Violation of Title V Permit and Illinois SIP that Incorporate these Requirements**

**Failure to Comply with Specified Equipment Leak Requirements**

220.     Plaintiff realleges and incorporates by reference Paragraphs 1–219 as if fully set forth herein.

221.     CITGO owns and operates the following process units at the Lemont Refinery: the Sat Gas Plant (ID No. 217); the Crude Process unit (ID No. 111); the Unisar unit (ID No. 118); the UDEX unit (ID No. 122); and a Blend Center.

222.     At all times relevant to this Claim, each of the above-referenced units was subject to the NSPS for Equipment Leaks of VOC in Petroleum Refineries at Subpart GGG of 40 C.F.R. Part 60.  Subpart GGG is found at 40 C.F.R. §§ 60.590–60.593.

223.     In relevant part, Subpart GGG requires facilities that are subject to Subpart GGG to comply with 40 C.F.R. Part 60, Subpart VV.  40 C.F.R. § 60.592.  Subpart VV is found at 40 C.F.R. §§ 60.480–60.489.

224.     With certain exceptions not relevant here, Subpart VV requires each open-ended valve or line ("OEL") to be equipped with a cap, blind flange, plug, or second valve.  40 C.F.R. § 60.482-6(a)(1).

225.     In 2007, CITGO failed to equip 3 open-ended lines in the 217 Sat Gas Plant and the 111 Crude process unit with a cap, blind flange, plug, or second valve, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulation at 40 C.F.R. § 60.482-6(a)(1).

226.     Subpart VV requires an owner/operator to record the identification numbers for equipment that is subject to Subpart VV.  *Id.* § 60.486(e)(1).  For each valve and pump subject to

Subpart VV, the owner/operator must undertake periodic monitoring to detect leaks. *Id.* §§ 60.482-7(a) (valves); 60.482-2(a) (pumps).

227. From January 2005 to approximately July 2007, CITGO failed to include 41 pieces of equipment in the 118 Unisar unit, the 217 Sat Gas Plant, and the 111 Crude in its LDAR program; failed to record the identification number of these pieces of equipment; and failed to periodically monitor these pieces of equipment, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulations at 40 C.F.R. §§ 60.486(e)(1); 60.482-7(a)(1); 60.482-2(a)(1).

228. From at least January 2005 until approximately July 2007, CITGO failed to conduct monthly monitoring of 14 valves in the 111 Crude process unit because it had improperly designated these valves as difficult-to-monitor, in violation of Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulation at 40 C.F.R. § 60.482-7(a)(1).

229. Subpart VV requires each owner/operator to comply with the monitoring procedures and requirements of Method 21 at 40 C.F.R. Part 60, Appendix A. 40 C.F.R. § 60.485(b)(1). In turn, Method 21, at 40 C.F.R. Part 60, Appendix A-7, Meth.21, Section 8.3.1, requires the owner or operator of an affected source to do as follows:

> Place the probe inlet [of the portable instrument that is capable of detecting emissions from equipment] at the surface of the component interface where leakage could occur. Move the probe along the interface periphery while observing the instrument readout. If an increased meter reading is observed, slowly sample the interface where leakage is indicated until the maximum meter reading is obtained. Leave the probe inlet at this maximum reading location for approximately two times the instrument response time. If the maximum observed meter reading is greater than the leak definition in the applicable regulation, record and report the results [as a leaking component].

230. On February 3, 6, 9, and 17, 2009, and March 5, 6, 14, and 27, 2009, and the first and second quarters of 2010, CITGO failed to perform Method 21 correctly, in violation of

Section 111 of the CAA, 42 U.S.C. § 7411, and the implementing regulations at 40 C.F.R. § 60.485(b)(1) and Section 8.3.1 of Method 21 of Appendix A-7 of 40 C.F.R. Part 60.

231.    The acts and omissions identified in this Claim also constitute violations of those provisions of the Lemont Refinery's Title V permit that require compliance with the NSPS provisions identified in this Claim; the prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and the provisions found in the federally enforceable Illinois Title V program that correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

232.    For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, CITGO is subject to civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

## CERCLA/EPCRA CLAIMS: 14–15

### General Allegations

233.    The Lemont Refinery is an "onshore facility" within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and a "facility" within the meaning of Section 329(4) of EPCRA, 42 U.S.C. § 11049(4). CITGO was and is "in charge of" this facility as that phrase is used in Section 103 of CERCLA, 42 U.S.C. § 9603(a), and was and is the "owner or operator" of this facility as that phrase is used in Section 304 of EPCRA, 42 U.S.C. § 11004.

234.     Hazardous substances have been deposited, stored, disposed of, placed, or otherwise come to be located at the Lemont Refinery, 42 U.S.C. § 9601(9), and hazardous chemicals are produced, used, or stored at the Lemont Refinery.  42 U.S.C. § 11004(a).

235.     Hydrogen sulfide is a "hazardous substance" for purposes of CERCLA and EPRCA emergency notification requirements.  42 U.S.C. § 9601(14); 42 U.S.C. §§ 11004(a),(b); 40 C.F.R. § 302.4 at Table 302.4; 40 C.F.R. Part 355, Appendix A.  The reportable quantity of hydrogen sulfide is 100 pounds, as listed in 40 C.F.R. § 302.4, Table 302.4 and 40 C.F.R. Part 355, Appendix A.

236.     Sulfur dioxide is an "extremely hazardous substance" for purposes of EPCRA emergency notification requirements.  42 U.S.C. §§ 11004(a),(b); 40 C.F.R. Part 355, Appendix A.  The reportable quantity of sulfur dioxide is 500 pounds, as listed at 40 C.F.R. Part 355, Appendix A.

## CERCLA and EPCRA
## CLAIM 14
### Violation of CERCLA and EPCRA Emergency Notification Requirements

**Failure to Notify National Response Center, Applicable SERC, and/or Applicable LEPC of Releases of Sulfur Dioxide and Hydrogen Sulfide in Excess of the Reportable Quantity Based on Insufficient Heating Value in Combustion Zone Gas and Oversteaming of Flares at the Lemont Refinery**

237.     Plaintiff realleges and incorporates by reference Paragraphs 1–236 as if fully set forth herein.

238.     On information and belief, on numerous occasions from 2006 to the present, the acts and omissions alleged in Paragraphs 192 and 193 resulted in releases of hydrogen sulfide and sulfur dioxide in excess of the reportable quantity of those substances.

239. The releases were not "federally permitted releases" as that term is used in Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6, and defined in Section 101(10) of CERCLA, 42 U.S.C. § 9601(10).

240. CITGO failed to immediately notify the National Response Center of the releases of hydrogen sulfide identified in Paragraph 238 as soon as it had knowledge of the releases within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

241. CITGO failed to immediately notify the applicable SERC and LEPC of the releases of hydrogen sulfide and sulfur dioxide identified in Paragraph 238 as soon as it had knowledge of the releases within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

242. The acts and omissions identified in this Claim constitute violations of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a); its implementing regulation at 40 C.F.R. § 302.6(a); Sections 304(a) and (b) of EPCRA, 42 U.S.C. §§ 11004(a) and (b); and their implementing regulation at 40 C.F.R. 355.40(b).

243. For the violations asserted in this Claim, pursuant to Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and the Federal Civil Penalties Inflation Adjustment Act of 1990, CITGO is subject to civil penalties of up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009, and up to $37,500 per day for each violation on and after January 13, 2009. Additionally, in the case of a second or subsequent violation, CITGO is subject to a civil penalty of up to $97,500 per day for each violation between March 16, 2004, and January 12, 2009; up to $107,500 per day for each violation between January 13, 2009, and December 6, 2013; and up to $117,500 per day for each violation on and after December 7, 2013.

**CERCLA and EPCRA**
**CLAIM 15**
**Violation of EPCRA Emergency Notification Requirements**

**Failure to Notify the SERC and Applicable LEPC**
**of Releases of Hydrogen Sulfide in Excess of the Reportable Quantity**
**Based on Sulfur Pit Releases**

244.    Plaintiff realleges and incorporates by reference Paragraphs 1–243 as if fully set forth herein.

245.    On information and belief, on numerous occasions between January 2009 and June 2010, CITGO failed to immediately notify the applicable SERC (State Authority) and LEPC (Local Authority) of releases of $H_2S$ from the sulfur pits at the Lemont Refinery's Sulfur Recovery Plant that were equal to, or greater than, the reportable quantity for $H_2S$, as required by Section 304(a) of EPCRA, 42 U.S.C. § 11004(a).

246.    On information and belief, on numerous occasions between January 2009 and June 2010, CITGO failed to provide a written follow-up emergency notice to the applicable SERC (State Authority) and LEPC (Local Authority) as soon as practicable after the releases of $H_2S$ described in the preceding paragraph which require notice under Section 304(a) of EPCRA, 42 U.S.C. § 11004(a), in accordance with the requirements of Section 304(c) of EPCRA, 42 U.S.C. § 11004(c).

247.    The acts and omissions identified in this Claim constitute violations of Section 304(a) and (c) of EPCRA, 42 U.S.C. §§ 11004(a) and (c).

248.    For the violations asserted in this Claim, pursuant to Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and the Federal Civil Penalties Inflation Adjustment Act of 1990, CITGO is subject to civil penalties of up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009, and up to $37,500 per day for each violation on and after

January 13, 2009.  Additionally, in the case of a second or subsequent violation, CITGO is

subject to a civil penalty of up to $97,500 per day for each violation between March 16, 2004,

and January 12, 2009; up to $107,500 per day for each violation between January 13, 2009, and

December 6, 2013; and up to $117,500 per day for each violation on and after December 7,

2013.

\* \* \* \*

## PRAYER FOR RELIEF

WHEREFORE, based upon the allegations in Paragraphs 1–248 of this Complaint, the

United States requests that this Court:

1.      Permanently enjoin CITGO from operating the Lemont Refinery except in

accordance with the CAA and all applicable federal regulations and applicable federally

enforceable state regulations;

2.      Order CITGO to operate the Lemont Refinery in compliance with the CAA

statutory and regulatory requirements set forth herein, the applicable SIP requirements, and the

PSD, Nonattainment NSR, and Title V permits applicable to the Lemont Refinery;

3.       Order CITGO to take other appropriate actions to remedy, mitigate, and offset

the harm to public health and the environment caused by the violations of the CAA alleged

herein;

4.      Assess a civil penalty against CITGO of up to $27,500 per day for each violation

of the CAA occurring between January 31, 1997, and March 15, 2004; up to $32,500 for each

violation of the CAA, CERCLA, and EPCRA occurring between March 16, 2004, and

January 12, 2009; and up to $37,500 per day for each violation occurring on and after

January 13, 2009.  Additionally, in the case of a second or subsequent violation of CERCLA and

EPCRA, assess a civil penalty against CITGO of up to $97,500 per day for each violation between March 16, 2004, and January 12, 2009, and up to $107,500 per day for each violation on and after January 13, 2009;

5.      Award Plaintiff its costs of this action; and

6.      Grant such other relief as the Court deems just and proper.

Respectfully Submitted,


s/ John C. Cruden
JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
Department of Justice



s/ Annette M. Lang
ANNETTE M. LANG
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4213
(202) 616-6584 (fax)
annette.lang@usdoj.gov

ZACHARY T. FARDON
United States Attorney
Northern District of Illinois

By:    s/ Jonathan Haile

JONATHAN HAILE
Assistant United States Attorney
219 S. Dearborn St., 5th Floor
Chicago, IL  60604
(312) 886-2055
Jonathan.haile@usdoj.gov

OF COUNSEL:

VIRGINIA SORRELL
Air Enforcement Division
Office of Civil Enforcement
U.S. EPA
1595 Wynkoop St.
Denver, CO 80202

**United States v. CITGO Petroleum Corp., et al.
Complaint**

# EXHIBIT 1

## February 26, 2009 NOV/FOV



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

REPLY TO THE ATTENTION OF:

**FEB 2 6 2009**

AE-17J

**CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

Claude Harmon, Manager
Health, Safety, Security & Environmental
Citgo Petroleum Corporation
135th Street & New Avenue
Lemont, Illinois   60439

Re:  Finding of Violation and Notice of Violation

Dear Mr. Harmon:

      This is to advise you that the U.S. Environmental Protection Agency has determined that Citgo Petroleum Corporation's facility in Lemont, Illinois (Citgo or facility) is in violation of the Clean Air Act (CAA) and associated state or local pollution control requirements. A list of the requirements violated is provided below. A Notice of Violation and Finding of Violation (NOV/FOV) for these violations is being issued and is enclosed for your review.

      The CAA requires the development of Primary and Secondary National Ambient Air Quality Standards to protect public health and welfare. To attain and maintain these standards, each State is required to develop an implementation plan according to Section 7410, 42 U.S.C. § 7410. The Illinois State Implementation Plan (Illinois SIP) at IAC 218.441 prohibits the release of certain petroleum manufacturing waste gas streams to the environment unless they are appropriately controlled.

      The CAA also requires that certain new sources comply with standards appropriate for the source's category. These New Source Performance Standards (NSPS) are required by Section 7411 of the CAA, 42 U.S.C. § 7411, with implementing regulations found at 40 CFR Part 60. The NSPS for Equipment Leaks of VOC in Petroleum Refineries, Subpart GGG, is found at 40 CFR § 60.590 and specifies control of equipment leaks.

      The purpose of these requirements is to reduce emissions that can compromise public health and welfare. Specifically, these requirements ensure that volatile organic compounds and hazardous air pollutants are being controlled to reduce the potential harm to the human respiratory system and reduce the risk of cancer.

EPA finds that Citgo has violated the Illinois State Implementation Plan, its Title V Permit for facility 197090AAI issued on January 9, 2006, and the NSPS for Equipment Leaks of VOC in Petroleum Refineries at 40 CFR § 60.590. Since Citgo violated its Title V permit, it has also violated Title V of the CAA and its associated regulations which require compliance with the terms and conditions of Title V permits.

Section 113 of the CAA gives EPA several enforcement options to resolve these violations, including: issuing an administrative compliance order, issuing an administrative penalty order, bringing a judicial civil action, and bringing a judicial criminal action. The option we select, in part, depends on the efforts taken by Citgo to correct the alleged violations and the timeframe in which you can demonstrate and maintain continuous compliance with the requirements cited in the NOV/FOV.

We are offering you the opportunity to request a conference with us about the violations alleged in the NOV/FOV. A conference should be requested within 10 days following receipt of this notice. A conference should be held within 30 days following receipt of this notice. This conference will provide you a chance to present information on the identified violations, any efforts you have taken to comply and the steps you will take to prevent future violations. Please plan for your facility's technical and management personnel to take part in these discussions. You may have an attorney represent and accompany you at this conference.

The EPA contact in this matter is Brian Dickens. You may contact him at (312) 886-6073 if you wish to request a conference. EPA hopes that this NOV/FOV will encourage Citgo to comply with the requirements of the Clean Air Act.

Sincerely,

ACTING

Cheryl L. Newton
Director
Air and Radiation Division

Enclosure

cc:    Ray Pilapil
      Illinois Environmental Protection Agency

2

**United States Environmental Protection Agency**
Region 5

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| Citgo Petroleum Corporation | ) | |
| Lemont, Illinois | ) | **FINDING OF VIOLATION** |
| | ) | |
| | ) | **EPA-5-09-05-IL** |
| Proceedings Pursuant to | ) | |
| the Clean Air Act, | ) | |
| 42 U.S.C. §§ 7401 et seq. | ) | |

## NOTICE AND FINDING OF VIOLATION

Citgo Petroleum Corporation (you or Citgo) owns and operates a petroleum manufacturing facility at 135th Street and New Avenue in Lemont, Illinois. This facility is a petroleum refinery that includes five steam assisted flares.

EPA is sending this Notice and Finding of Violation (NOV/FOV) to you for not properly controlling emissions of organic material from three of your flares. The underlying statutory and regulatory requirements include provisions of the Clean Air Act (the Act or CAA), its implementing regulations and the Illinois Title V Permit Program.

### Regulatory and Statutory Authority

The regulations and permit conditions relevant to this NOV/FOV are as follows:

1. The Illinois State Implementation Plan (Illinois SIP) at IAC 218.441 prohibits the release of petroleum manufacturing waste gas streams containing more than 100 ppm organic material unless the waste stream is reduced to less than 8 lb/hr or 10 ppm of organic material, or treated with a device that achieves a combustion efficiency of 85% or more. This provision is incorporated into Citgo's Title V permit for facility 197090AAI at section 5.3.9.

2. Equipment within the HF Alkylation Unit is subject to the leak detection and repair provisions of the New Source Performance Standards (NSPS) for Equipment Leaks of VOC in Petroleum Refineries, Subpart GGG, found at 40 C.F.R. § 60.590. The applicability of Subpart GGG is set forth in Citgo's Title V permit for facility 197090AAI at section 7.8.3 (e).

3. The NSPS provisions at Subpart GGG reference the Standards of Performance for Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry, Subpart VV, found at 40 C.F.R § 60.480.

4. The Standards of Performance for Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry at 40 C.F.R. § 60.482-10(e) state, "Owners or operators of control devices used to comply with the provisions of this subpart shall monitor these control devices [flares] to ensure they are operated and maintained in conformance with their designs". This requirement can be found in Citgo's Title V permit at section 7.8.8 (e)(i).

5. On March 7, 1995, EPA gave the Illinois Title V Clean Air Act Permit Program (CAAPP) interim approval as a 40 C.F.R. Part 70 permit program under the authority of Section 502 of the Act, 42 U.S.C. § 7661(a) (60 Fed. Reg. 12478). On December 4, 2001, EPA gave the Illinois Title V CAAPP final approval as a 40 C.F.R. Part 70 permit program (66 Fed. Reg. 62946). The regulation at 40 C.F.R. § 70.6(b)(1) specifies that all terms and conditions in a permit issued under a Part 70 program are enforceable by EPA under the Act. Citgo was issued Title V permit for source ID 197090AAI on August 10, 2000. The Title V permit was renewed on January 9, 2006.

## Explanation of Violations

6. Citgo uses flares, including Flares 1, 4 and 5, to control emissions. Flare 5 receives waste gases and process leaks from the HF Alkylation unit. All three flares are steam-assisted, which means that steam is added to the waste, or vent gas stream to enhance combustion and prevent the formation of smoke. Steam is added in proportion to the amount of vent gas. It is common practice to measure the amount of steam as a ratio of the mass of steam per unit mass of vent gas (lb/lb).

7. In March 1997, the American Petroleum Institute (API) released a report entitled "Guide for Pressure-Relieving and Depressuring Systems." The document discusses proper practices for venting organic material. With respect to smoke suppression at steam-assisted flares, the authors of the document state, "the amount of steam required is primarily a function of the gas composition, flow rate and steam pressure and flare tip design and is normally in the range of 0.25 to 1.0. (lb/lb)"

8. In July 1983, EPA released report EPA 600/2-83-052, titled Flare Efficiency Study. This study, partially funded by EPA and the Chemical Manufacturers Association (CMA), included various tests to determine the combustion efficiency and hydrocarbon destruction efficiency of flares under a variety of operating conditions. Certain tests were conducted on a steam-assisted flare provided by John Zink Company. The tests performed included a wide range of steam flows and steam-to-vent gas ratios. The data collected showed decreasing combustion efficiencies when the steam-to-vent gas ratio was above 3.5. The tests showed the following efficiencies at the following steam-to-vent gas ratios:

2

| Pounds of Steam to One Pound of Vent Gas | Combustion Efficiency (%) |
|---|---|
| 3.45 | 99.7 |
| 5.67 | 82.18 |
| 6.86 | 68.95 |

The report concluded that excessive steam-to-vent gas ratios caused steam quenching of the flame during the tests which resulted in lower combustion efficiency.

9. EPA has identified other publicly available studies and EPA reports that evaluate how flare combustion efficiency is affected by steam addition. The conclusions of these studies support those of EPA 600/2-83-052.

10. On December 21, 2007, and February 18, 2008, Citgo provided information to EPA in response to an EPA information request, including design documents and operating data on Flares 1, 4, and 5 for the period from November 1, 2004 to December 4, 2007.

11. Citgo provided its Process Specification sheet for Flare 1 that sets forth the design vent gas flow rate and associated steam flow rate. Citgo also provided its Data Sheet for Flare 1 that specifies the design minimum steam addition rate for low vent gas flow conditions. According to the operating data that Citgo provided, during low vent gas flow conditions Citgo supplied steam in excess of the minimum steam addition rate set forth in the Data Sheet. In fact, Citgo set the minimum steam flow at a value more than twice the design minimum. By supplying excess steam, Citgo reduced the combustion efficiency of Flare 1 on various days in 2005, 2006, and 2007 below 85% and released a waste gas stream to the environment with an organic material concentration greater than 10 ppm and at a rate exceeding 8 lb/hr.

12. Citgo provided its Operations Manual for Flare 4 that sets forth the design vent gas flow rate and associated steam flow rate. It states in the Operations Manual for Flare 4 that, "Normal steam to hydrocarbon ratios are in the order of 0.2 to 0.4." According to the operating data that Citgo provided, Citgo supplied steam to the flare far in excess of the recommended ratio, and added more steam than was prescribed by the Operations Manual for particular hydrocarbon flow rates. This failure to adhere to the flare's design criteria on various days in 2004, 2005, 2006 and 2007 reduced the combustion efficiency of Flare 4 below 85% and released a waste gas stream to the environment with an organic concentration greater than 10 ppm and at a rate exceeding 8 lb/hr.

3

13. Citgo provided its Flare System Specification Sheet for Flare 5 that sets forth a minimum flow of steam through the steam ring and center steam injection point during standby or low vent gas flow conditions. The Flare System Specification Sheet for Flare 5 also sets out a maximum allowable design amount of steam. According to the operating data that Citgo provided, Citgo supplied much more steam than was required for low vent gas flow conditions and on at least two occasions supplied more steam than the maximum required under the highest flow conditions. This failure to adhere to the flare's design on various days in 2006 and 2007 reduced the combustion efficiency of Flare 5 below 85% and released a waste gas stream to the environment with an organic concentration greater than 10 ppm and at a rate exceeding 8 lb/hr.

### Environmental Impact of Violations

14. These violations have caused or can cause excess emissions of volatile organic compounds (VOC) and/or hazardous air pollutants (HAP). VOC cause ground level ozone, which can irritate the human respiratory system and reduce lung function.

7/26/09
Date

Cheryl L. Newton, Director    ACTING
Air and Radiation Division

4

## CERTIFICATE OF MAILING

I, Loretta Shaffer, certify that I sent a Notice and Finding of Violation, No. EPA-5-09-05-IL, by Certified Mail, Return Receipt Requested, to:

Claude Harmon, Manager
Health, Safety, Security & Environmental
Citgo Petroleum Corporation
135th Street & New Avenue
Lemont, Illinois 60439

I also certify that I sent copies of the Finding of Violation and Notice of Violation by first class mail to:

Ray Pilapil, Manager
Compliance and Enforcement Section
Illinois Environmental Protection Agency
1012 North Grand Avenue East
Springfield, Illinois 62702

on the 27 day of Feb , 2009.

Loretta Shaffer, Secretary
AECAS (MN-OH)

CERTIFIED MAIL RECEIPT NUMBER: 7001 0320 0006 0186 0507

6

**United States v. CITGO Petroleum Corp., et al.**
**Complaint**

# EXHIBIT 2

## September 30, 2011 NOV/FOV



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 5
77 WEST JACKSON BOULEVARD
CHICAGO, IL 60604-3590

**SEP 3 0 2011**

REPLY TO THE ATTENTION OF

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Claude Harmon
Manager HSS&E
CITGO Petroleum Corporation
135th Street & New Avenue
Lemont, Illinois 60439

Dear Mr. Harmon:

The U.S. Environmental Protection Agency is issuing the enclosed Notice of Violation and Finding of Violation (NOV/FOV) to CITGO Petroleum Corporation's Lemont refinery at 135th Street & New Avenue, Lemont, Illinois (CITGO or refinery), under Section 113(a)(1) of the Clean Air Act (the Act), 42 U.S.C. § 7413(a)(1). We find that you are violating Prevention of Significant Deterioration regulations, non-attainment New Source Review requirements, the New Source Performance Standards for Petroleum Refineries, the National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks, Operating Permit requirements under Title V of the Act, the Illinois State Implementation Plan, and the Consent Decree entered January 26, 2005, at your refinery located in Lemont, Illinois.

Section 113 of the Act gives us several enforcement options to resolve these violations, including issuing an administrative compliance order, issuing an administrative penalty order, bringing a judicial civil action, and bringing a judicial criminal action.

We are offering you the opportunity to request a conference with us to discuss the violations identified in this NOV/FOV. A conference should be requested within 10 days following receipt of this notice. This conference will provide you a chance to present information on the identified violations, any efforts you have taken to comply, and the steps you will take to prevent future violations. Please plan for the refinery's technical and management personnel to take part in these discussions. You may have an attorney represent and accompany you at this conference.

Recycled/Recyclable • Printed with Vegetable Oil Based Inks on 100% Recycled Paper (50% Postconsumer)

The EPA contact in this matter is Mark Ackerman. You may call him at (312) 353-4145 to request a conference. EPA hopes that this notice will encourage CITGO's compliance with the requirements of the Act.

Sincerely yours,

Cheryl L. Newton
Director
Air and Radiation Division

cc:     Ray Pilapil, Manager
        Compliance and Enforcement Section
        Illinois Environmental Protection Agency

Enclosure

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
### REGION 5

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| **CITGO Petroleum Corporation** | ) | **NOTICE OF VIOLATION and** |
| **Lemont, Illinois** | ) | **FINDING OF VIOLATION** |
| | ) | |
| | ) | **EPA-5-11-IL-10** |
| Proceedings Pursuant to | ) | |
| the Clean Air Act | ) | |
| 42 U.S.C.§ § 7401 et seq | ) | |

## NOTICE AND FINDING OF VIOLATION

CITGO Petroleum Corporation (you or CITGO) owns and operates a petroleum refinery at 135th Street & New Avenue, Lemont, Illinois (CITGO or refinery). The refinery consists of a number of pieces of equipment that generate air pollution and are subject to provisions of the Clean Air Act. This includes a fluidized catalytic cracking unit, sulfur recovery plant, heaters, process tanks and other related equipment.

The U.S. Environmental Protection Agency (EPA) is sending this Notice of Violation and Finding of Violation (NOV/FOV or Notice) to notify you of several items. We find that you constructed major modifications causing significant net emissions increases in carbon monoxide (CO), nitrogen oxides ($NO_x$), particulate matter (PM), PM less than 10 microns ($PM_{10}$), PM less than 2.5 microns ($PM_{2.5}$), and sulfuric acid mist at a major stationary source in an area that was designated as nonattainment for $PM_{2.5}$, and attainment or unclassifiable for CO, $NO_x$, PM, $PM_{10}$ and sulfuric acid mist at the time of the modifications, without first obtaining a construction permit meeting the non-attainment New Source Review requirements in the Illinois State Implementation Plan, 40 C.F.R. Part 51, Appendix S, and the Prevention of Significant Deterioration requirements. We find that you failed to properly operate emissions units in accordance with various provisions in the New Source Performance Standards. We find that you exceeded carbon monoxide emission limits in your Title V operating permit. We find that you failed to control the purged liquid from your benzene sampling process in accordance with the National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks.

Section 113 of the Act provides you with the opportunity to request a conference with us to discuss the violations alleged in the NOV/FOV. This conference will provide you a chance to present information on the identified violations, any efforts you have taken to comply, and the steps you will take to prevent future violations. Please plan for the facility's technical and management personnel to take part in these discussions. You may have an attorney represent and accompany you at this conference.

## I.    Statutory and Regulatory Background

1.    The Clean Air Act (the Act) is designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

### A.    The National Ambient Air Quality Standards

2.    Section 108(a) of the Act, 42 U.S.C. § 7408(a), requires the Administrator of EPA to identify and prepare air quality criteria for each air pollutant, emissions of which may endanger public health or welfare, and the presence of which results from numerous or diverse mobile or stationary sources.  For each such "criteria" pollutant, Section 109 of the Act, 42 U.S.C. § 7409, requires EPA to promulgate national ambient air quality standards (NAAQS) requisite to protect the public health and welfare.

3.    Pursuant to Sections 108 and 109 of the Act, 42 U.S.C. §§ 7408 and 7409, EPA has identified CO, $NO_X$, PM, $PM_{10}$, and $PM_{2.5}$, among others, as criteria pollutants, and has promulgated NAAQS for these pollutants.  40 C.F.R. §§ 50.6, 50.7, 50.8, 50.9, 50.10, and 50.11.

4.    Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is termed an "attainment" area with respect to such pollutant.  An area that does not meet the NAAQS for a particular pollutant is termed a "nonattainment" area with respect to such pollutant.

5.    An area that cannot be classified as either "attainment" or "nonattainment" with respect to a particular pollutant due to insufficient data is termed "unclassifiable" with respect to such pollutant.

6.    At all times relevant to this Notice, Lemont, Illinois, located in Will County, the area in which CITGO is located, has been classified as nonattainment for $PM_{2.5}$ (*see*, 70 Fed. Reg. 944 (January 5, 2005), 74 Fed. Reg. 58688 (November 13, 2009), 74 Fed. Reg. 62243 (November 27, 2009)); and has been classified as attainment or unclassifiable for CO, $NO_X$, PM and $PM_{10}$.

### B.    The Prevention of Significant Deterioration Program

7.    Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the NAAQS standards.  These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.  42 U.S.C. § 7470.  These provisions are referred to herein as the "PSD program."

2

8.  Section 165(a) of the Act, 42 U.S.C. § 7475(a), prohibits, among other things, a "major emitting facility" from constructing a "major modification" in any area which is attaining the NAAQS, unless it has obtained a pre-construction permit issued under the PSD regulations that applies "Best Available Control Technology" (BACT) to control emissions from the proposed modified emissions unit, and has conducted an analysis to determine the air quality impacts of the modification. *See also*, 40 C.F.R. § 52.21(a)(2)(iii).

9.  Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates petroleum refineries which emit or have the potential to emit 100 tons per year (tpy) or more of any pollutant to be a "major emitting facility." *See also* 40 C.F.R. § 52.21(b)(1)(i)(a).

10. Section 169(2)(C) of the Act, 42 U.S.C. § 7479(2)(C), defines "construction" to include "modification" (as defined in Section 111(a) of the Act). "Modification" is defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a), to be "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." *See also* 40 C.F.R. § 52.21(b)(1)(i)(a).

11. Sections 110(a) and 161 of the Act, 42 U.S.C. §§ 7410(a) and 7471, require each state to adopt a SIP that contains emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality in areas designated as attainment or unclassifiable. The Administrator promulgated regulations at 40 C.F.R. § 51.166 setting forth state implementation plan (SIP) approval requirements for the prevention of significant deterioration of air quality.

12. A state may comply with Sections 110(a) and 161 of the Act, 42 U.S.C. §§ 7410(a) and 7471, by having its own PSD regulations, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166, approved by EPA as part of its SIP. If a state does not have a PSD program that has been approved by EPA and incorporated into its SIP, the federal PSD regulations set forth at 40 C.F.R. § 52.21 may be incorporated by reference into the SIP. 40 C.F.R. § 52.21(a).

13. On August 7, 1980, EPA disapproved Illinois' proposed PSD program and then incorporated by reference the PSD regulations of 40 C.F.R. § 52.21, except paragraph 40 C.F.R. § 52.21(a)(1), into the Illinois SIP. 40 C.F.R. § 52.738 (45 Fed. Reg. 52676, 52741). On January 29, 1981, EPA delegated to the Illinois Environmental Protection Agency (IEPA) the full authority to implement and enforce the federal PSD program. 46 Fed. Reg. 9584. On December 31, 2002, EPA published revisions to the PSD and non-attainment new source review (NSR) regulations in 40 C.F.R. Parts 51 and 52. 67 Fed. Reg. 80186. These revisions are referred to as "NSR Reform." On December 24, 2003, EPA issued a final rule incorporating the newly promulgated PSD provisions of NSR Reform into the Illinois SIP. 68 Fed. Reg. 74489. The NSR Reform provisions at 40 C.F.R. § 52.21 were incorporated into and were part of the Illinois SIP at the time of the major modifications alleged in this Notice.

3

14. The PSD regulations set forth in 40 C.F.R. § 52.21 apply to any "major stationary source" that intends to construct a "major modification" in an attainment or unclassifiable area. 40 C.F.R. § 52.21(i)(2).

15. 40 C.F.R. § 52.21(b)(1)(i)(a) defines "major stationary source" as any stationary source which emits, or has the potential to emit, 100 tons per year or more of any air pollutant subject to regulation under the Act if the stationary source belongs to one of the listed source categories. Petroleum Refining is a listed source category.

16. 40 C.F.R. § 52.21(b)(2)(i) defines "major modification" as any physical change or change in the method of operation of a major stationary source that would result in a significant net emission increase of any pollutant subject to regulation under the Act.

17. 40 C.F.R. § 52.21(b)(3)(i) defines "net emissions increase" as the amount by which the sum of the following exceeds zero: (*a*) the increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(iv) of this section; and (*b*) any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable.

18. Under the PSD regulations, a "significant" net emissions increase means an increase in the rate of emissions that would equal or exceed any of the following rates for the following pollutants: 100 tpy of CO, 40 tpy of $NO_X$, 25 tpy of PM, 15 tpy of $PM_{10}$, and 7 tpy of sulfuric acid mist. 40 C.F.R. § 52.21(b)(23)(i).

19. The PSD regulations define "actual emissions" as the average rate, in tpy, at which the unit "actually emitted the pollutant during a two-year period which precedes the particular date" and which is representative of normal operation. 40 C.F.R. § 52.21(b)(21)(i)-(ii). In addition, for any emissions unit that "has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date." 40 C.F.R. § 52.21(b)(21)(iv).

20. 40 C.F.R § 52.21(a)(2)(iv) provides that the requirements of the PSD program will be applied in accordance with the principles set out in paragraphs (a)(2)(iv)(*a*) through (*f*).

21. 40 C.F.R § 52.21(a)(2)(iv)(*b*) provides that the procedure for calculating (before beginning actual construction) whether a significant emissions increase will occur depends upon the type of emissions units being modified, according to paragraphs (a)(2)(iv)(*c*) through (*f*) of this section. Emission units can be either existing or new. 67 Fed. Reg. 80186, at 80198.

22. 40 C.F.R § 52.21(a)(2)(iv)(*c*) requires an actual-to-projected-actual applicability test for projects that only involve existing emissions units.

23. 40 C.F.R § 52.21(a)(2)(iv)(*d*) requires an actual-to-potential test for projects that only involve construction of a new emissions unit(s).

4

24. 40 C.F.R § 52.21(a)(2)(iv)(*f*) requires a hybrid test for projects that involve existing and new emissions units.

25. Under 40 C.F.R § 52.21(a)(2)(iv)(*f*), using the hybrid test, a significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs (a)(2)(iv)(*c*) through (*d*) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant.

26. 40 C.F.R § 52.21(a)(2)(iii) prohibits the actual construction of a major stationary source or modification without a permit which states that the major stationary source or modification will meet the requirements of 40 C.F.R. § 52.21(j) through (r).

27. Under the PSD regulations, "construction" means "any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit)" that "would result in a change in emissions." 40 C.F.R. § 52.21(b)(8); *see also* 42 U.S.C. § 7479(2)(C) ("construction" includes the "modification" (as defined in Section 111(a) of the Act, 42 U.S.C. § 7411(a)) of any source or facility).

28. A major stationary source subject to the requirements of paragraphs (j) through (r) must, among other things, perform an analysis of source impacts, perform air quality modeling and analysis, apply BACT, and allow for meaningful public participation in the process. 40 C.F.R. § 52.21(j)-(r).

29. 40 C.F.R. § 52.21(b)(12) defines BACT as an emissions limitation (including a visible emission standard) based on the maximum degree of reduction for each pollutant subject to regulation under Act which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant.

30. No major stationary source to which the requirements of paragraphs (j) through (r) of 40 C.F.R. § 52.21 apply shall begin actual construction of a major modification without a permit that states that the stationary source or modification will meet those requirements (a PSD permit). 40 C.F.R. § 52.21(i)(1).

31. Any owner or operator of a source or modification subject to 40 C.F.R. § 52.21 who constructs or operates a source not in accordance with a PSD application or commences construction without applying for and receiving approval thereunder shall be subject to an enforcement action. 40 C.F.R. § 52.21(r)(1).

32. 40 C.F.R. § 52.23 states, among other things, that failure to comply with any provision of 40 C.F.R. Part 52, or with any approved regulatory provision of a SIP, shall render the person or governmental entity so failing to comply in violation of a requirement of an

applicable implementation plan and subject to enforcement action under Section 113 of the Act.

## C. The NonAttainment New Source Review Program

33. Part D of Title I of the Act, 42 U.S.C. §§ 7501-7515, sets forth provisions for New Source Review (NSR) requirements for areas designated as being in nonattainment with the NAAQS standards. These provisions are referred to herein as the "Nonattainment NSR" program. The Nonattainment NSR program is intended to reduce emissions of air pollutants in areas that have not attained NAAQS so that the areas make progress towards meeting the NAAQS.

34. Section 173(a) of the Act, 42 U.S.C. 7503(a), provides, among other things, that construction and operating permits may be issued if, among other things, sufficient offsetting emission reductions have been obtained to reduce existing emissions to the point where reasonable further progress towards meeting the national ambient air quality standards is maintained, and the pollution controls to be employed will reduce emissions to the "lowest achievable emission rate" (LAER).

35. Pursuant to Sections 110 and 172(c)(5) of the Act, 42 U.S.C. §§ 7410 and 7502(c)(5), each state is required to adopt Nonattainment NSR SIP rules that include provisions to require permits that conform to the requirements of Section 173 of the Act, 42 U.S.C. § 7503, for the construction and operation of modified major stationary sources within nonattainment areas. Section 173 of the Act, in turn, sets forth a series of minimum requirements for the issuance of permits for major modifications to major stationary sources within nonattainment areas. EPA promulgated regulations at 40 C.F.R. § 51.165 to implement Nonattainment NSR permit program requirements under Sections 172(c)(5) and 173 of the Act. 51 Fed. Reg. 40669 (November 7, 1986), and subsequent amendments.

### Illinois New Source Review

36. On December 17, 1992, EPA approved the Illinois non-attainment NSR SIP rules, 35 Illinois Administrative Code (IAC) Part 203. 57 Fed. Reg. 59928. Illinois submitted and EPA approved revisions to this rule on September 27, 1995 (60 Fed. Reg. 49780) and May 13, 2003 (68 Fed. Reg. 25504).

37. 35 IAC § 203.207(a) defines "major modification" as a physical change, or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant for which the area is designated a nonattainment area.

38. 35 IAC § 203.203 provides that a construction permit is required prior to actual construction of a major new source or major modification, and that the application for the permit must meet the requirements of Part 203, including Subpart C, "Requirements for Major Stationary Sources in Nonattainment Areas"

39.    35 IAC Part 203, Subpart C, at § 203.301(a), defines "lowest achievable emission rate" as, in pertinent part, "the most stringent emission limitation which is achieved in practice by such a class or category of stationary source."

40.    35 IAC Part 203, Subpart C, at § 203.302(a), provides that the owner or operator of a new major source or major modification shall provide emission offsets equal to or geater than the allowable emissions from the source, or the net increase in emissions from the modification, sufficient to allow the Agency to determine that the source or modification will not interfere with reasonable further progress.

41.    35 IAC § 203.103 defines "actual construction" as initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework, and erection of permanent storage structures.

42.    35 IAC § 203.201 states that in any nonattainment area, no person shall cause or allow the construction of a new major stationary source or major modification that is major for the pollutant for which the area is designated a nonattainment area, except as in compliance with 35 IAC Part 203 for that pollutant.

**40 C.F.R. Part 51, Appendix S**

43.    On May 16, 2008, EPA promulgated regulations implementing the NSR Program for Particulate Matter Less Than 2.5 Micrometers. 73 Fed. Reg. 28321. The preamble to the final rule provides that because the $PM_{2.5}$ nonattainment designations became effective on April 5, 2005 (*see* 70 Fed. Reg. 944 (January 5, 2005)), states were required to issue major Nonattainment NSR permits that address the requirements of Section 173 of the Act as required for $PM_{2.5}$ as of the effective date of these regulations, July 15, 2008. The preamble also provides that after July 15, 2008, states are not permitted to implement a Nonattainment NSR program for $PM_{2.5}$ using $PM_{10}$ as a surrogate for the $PM_{2.5}$ Nonattainment NSR requirements. Further, until EPA approves changes to a state's SIP-approved Nonattainment NSR program to reflect the new requirements under 40 C.F.R. § 51.165, states are to implement a transitional $PM_{2.5}$ Nonattainment NSR program under 40 C.F.R. Part 51, Appendix S (as amended by the May 16, 2008 rulemaking). 73 Fed. Reg. at 28342. On January 21, 2011, the IEPA submitted to EPA a "Planned Revision to Illinois' New Source Review Rules to Address $PM_{2.5}$." As of the date of this Notice, EPA has not published in the Federal Register any notice pertaining to EPA's review or approval of IEPA's planned revisions to its Nonattainment NSR program to address $PM_{2.5}$.

44.    40 C.F.R. § 52.24(k) provides that for an area designated as nonattainment after July 1, 1979, the Emission Offset Interpretative Ruling, 40 CFR Part 51, Appendix S (Appendix S) shall govern permits to construct and operate applied for during the period between the date of designation as nonattainment and the date the NSR permit program meeting the requirements of Part D is approved.

45. On March 8, 2007, EPA finalized revisions to Appendix S to conform the nonattainment permitting rules that apply during the SIP development period following nonattainment designations. The revisions to Appendix S conform the permitting rules to, among other things, the NSR reform provisions. 72 Fed. Reg. 10367.

46. Appendix S at II.A.3 defines "potential to emit" as the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is federally enforceable.

47. Appendix S at II.A.4(i)(b)(1) defines "major stationary source" as any stationary source which emits, or has the potential to emit, 100 tons per year or more of any pollutant subject to regulation under the Act.

48. Appendix S at II.A.5(i) defines "major modification" as any physical change in or change in the method of operation of a major stationary source that would result in: (a) a significant emissions increase of a regulated NSR pollutant and (b) a significant net emissions increase of that pollutant from the major stationary source.

49. Appendix S at II.A.6(i) defines "net emissions increase," with respect to any regulated NSR pollutant emitted by a major stationary source, as the amount by which the sum of the following exceeds zero: (a) the increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph IV.J of Appendix S; and (b) any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable.

50. Appendix S at II.A.10(i) defines "significant" as, in reference to a net emissions increase or the potential of a source to emit the following pollutant, a rate of emissions that would equal or exceed the following rate:
   $PM_{2.5}$: 10 tpy of direct $PM_{2.5}$ emissions; 40 tpy of sulfur dioxide emissions.

51. Appendix S at IV.I.1 requires that to determine whether a project constitutes a major modification, the reviewing authority shall apply the principles set out in paragraphs IV.I.1(i) through (v).

52. Appendix S at IV.I.1(ii) provides that the procedure for calculating (before beginning actual construction) whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs IV.I.1(iii) through (v).

53. Appendix S at II.A.7 defines "emissions unit" as any part of a stationary source that emits or would have the potential to emit any regulated NSR pollutant. There are two types of emissions units: (a) a new emissions unit is any emissions unit which is (or will be)

newly constructed and which has existed for less than 2 years from the date such emissions unit first operated; (b) an existing emissions unit is any emissions unit that does not meet the definition of a new emissions unit.

54. Appendix S at IV.I.1(iii) requires an actual-to-projected-actual applicability test for projects that only involve existing emissions units.

55. Appendix S at IV.I.1(iv) requires an actual-to-potential test for projects that only involve construction of a new emissions unit(s).

56. Appendix S at IV.I.1(v) requires a hybrid test for projects that involve existing and new emissions units.

57. Under Appendix S at IV.I.1(v), using the hybrid test, a significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs IV.I.1(iii) through (iv) of Appendix S as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph II.A.10 of Appendix S).

58. Appendix S at IV.A specifies that if the reviewing authority finds that the major stationary source or major modification would be constructed in an area designated in 40 CFR 81.300 *et seq.* as nonattainment for a pollutant for which the stationary source or modification is major, approval may be granted only if the following conditions are met:

*Condition 1.* The new source is required to meet an emission limitation which specifies the LAER for each emission unit.

*Condition 2.* The applicant must certify that all existing major sources owned or operated by the applicant (or any entity controlling, controlled by, or under common control with the applicant) in the same State as the proposed source are in compliance with all applicable emission limitations and standards under the Act (or are in compliance with an expeditious schedule which is Federally enforceable or contained in a court decree).

*Condition 3.* Emission reductions (offsets) from existing sources in the area of the proposed source (whether or not under the same ownership) are required such that there will be reasonable progress toward attainment of the applicable NAAQS.

*Condition 4.* The emission offsets will provide a positive net air quality benefit in the affected area.

59. Appendix S at II.A.18 defines "lowest achievable emission rate" as, for any source, the more stringent rate of emissions based on the following: (i) the most stringent emissions limitation which is contained in the implementation plan of any State for such class or category of stationary source, unless the owner or operator of the proposed stationary source demonstrates that such limitations are not achievable; or (ii) the most stringent

emissions limitation which is achieved in practice by such class or category of stationary source. This limitation, when applied to a modification, means the lowest achievable emissions rate for the new or modified emissions units within the stationary source. In no event shall the application of this term permit a proposed new or modified stationary source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance.

60. Appendix S at IV.D requires that the owner or operator of a new or modified major stationary source may comply with any offset requirement in effect under Appendix S for increased emissions of any air pollutant only by obtaining emissions reductions of such air pollutant from the same source or other sources in the same nonattainment area.

## D. New Source Performance Standards

### General Provisions

61. EPA promulgated the General Provisions of the New Source Performance Standards on December 23, 1971. *See* 36 Fed. Reg. 24877. The General Provisions are codified at 40 C.F.R. § 60.1 *et seq.*

62. 40 C.F.R. 60.11(d) states: "At all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions."

63. 40 C.F.R. § 60.13 provides that "[a]ll continuous monitoring systems required under applicable subparts shall be subject to the provisions of this section . . . ." Subsection 60.13(e) provides that "except for system breakdowns, repairs, calibration checks, and zero and span adjustments . . . all continuous monitoring systems shall be in continuous operation . . . ." The requirements of 40 C.F.R. § 60.13 apply to, among other subparts, the continuous monitoring system requirements set forth in 40 C.F.R. Part 40, Subpart J.

### Subpart J: Petroleum Refineries

64. EPA promulgated New Source Performance Standards for Petroleum Refineries (NSPS Subpart J) on March 15, 1978. *See* 43 Fed. Reg. 10868. NSPS Subpart J is codified at 40 C.F.R. §§ 60.100 – 60.109.

65. 40 C.F.R. § 60.101(g) provides that "*[f]uel gas combustion device* means any equipment, such as process heaters, boilers and flares used to combust fuel gas . . . ."

66. 40 C.F.R. § 60.102(a)(1) provides that no owner or operator of any fluid catalytic cracking unit (FCCU) catalyst regenerator subject to the requirements of this subpart shall discharge from the FCCU catalyst regenerator "particulate matter in excess of 1.0 kg/Mg (2.0 lb/ton) of coke burn-off in the catalyst regenerator."

67. 40 C.F.R. § 60.105(a)(1) and (4) requires that "continuous monitoring systems shall be installed, calibrated, maintained, and operated by the owner or operator subject to the

provisions of this subpart as follows . . . an instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in fuel gases before being burned in any fuel gas combustion device."

68.  40 C.F.R. § 60.105(a)(1) and (5) requires that "continuous monitoring systems shall be installed, calibrated, maintained, and operated by the owner or operator subject to the provisions of this subpart as follows . . . [f]or Claus sulfur recovery plants with oxidation control systems or reduction control systems followed by incineration subject to § 60.104(a)(2)(i), an instrument for continuously monitoring and recording the concentration (dry basis, zero percent excess air) of $SO_2$ emissions into the atmosphere."

**E.    National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks**

69.  EPA promulgated National Emission Standards for Organic Hazardous Air Pollutants (HON) for Equipment Leaks on April 22, 1994. *See* 59 Fed. Reg. 19568. The HON for equipment leaks is codified at 40 C.F.R. Part 63, Subpart H, § 63.160 *et seq.*

70.  40 C.F.R. § 63.166(b) requires that each sampling connection system be equipped with a closed-purge, closed-loop, or closed-vent system to collect and recycle purged liquid back into a process, capture and transport it to a control device, or collect, store, and transfer it to a waste management unit, a treatment, storage or disposal facility, or a facility that manages municipal or industrial solid waste.

**F.    Title V Requirements**

71.  Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), provides that no source may operate without a Title V permit after the effective date of any permit program approved or promulgated under Title V of the Act. EPA first promulgated regulations governing state operating permit programs on July 21, 1992. *See* 57 Fed. Reg. 32295; 40 C.F.R. Part 70.

72.  EPA promulgated interim approval of the Illinois Title V program on March 7, 1995. *See* 60 Fed. Reg. 12478. EPA promulgated full approval of the Illinois Title V program on November 30, 2001. *See* 40 C.F.R. Part 70, Appendix A. Illinois' Title V program became effective on this date. *See* 66 Fed. Reg. 62946.

73.  The Illinois regulations governing the Title V permitting program are codified at 415 Illinois Compiled Statutes (ILCS) 5/39.5, and are federally enforceable pursuant to Section 113(a)(3).

74.  Section 503 of the CAA, 42 U.S.C. § 7661b, sets forth the requirement to submit a timely, accurate, and complete application for a permit, including information required to be submitted with the application.

75.  Section 504(a) of the CAA, 42 U.S.C. § 7661c(a), requires that each Title V permit include enforceable emission limitations and standards, a schedule of compliance, and other conditions necessary to assure compliance with applicable requirements, including those contained in a SIP.

76. 40 C.F.R. § 70.1(b) provides that: "All sources subject to these regulations shall have a permit to operate that assures compliance by the source with all applicable requirements." *See also* 415 ILCS 5/39.5.7.a.

77. 40 C.F.R § 70.2 defines "applicable requirement" to include "(1) Any standard or other requirement provided for in the applicable implementation plan approved or promulgated by EPA through rulemaking under title I of the Act that implements the relevant requirements of the Act, including revisions to that plan promulgated in part 52 of this chapter . . .." *See also* 415 ILCS 5/39.5.1.

78. 40 C.F.R. § 70.7(b) provides that no source subject to 40 C.F.R. Part 70 requirements may operate without a Title V permit as specified in the Act. *See also* 415 ILCS 5/39.5.6.b

79. 40 C.F.R. § 70.5(a) and (c) require timely and complete permit applications for Title V permits with required information that must be submitted and 40 C.F.R. § 70.6 specifies required permit content. *See also* 415 ILCS 5/39.5.5, 39.5.6, and 39.5.7.

80. 40 C.F.R. § 70.5(b) provides that: "Any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application shall, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information. In addition, an applicant shall provide additional information as necessary to address any requirements that become applicable to the source after the date it filed a complete application but prior to release of a draft permit." *See also* 415 ILCS 39.5.5.i.

## II. Consent Decree and Permitting Background

## A. Consent Decree Requirements

81. On October 6, 2004, CITGO, EPA and the states of Illinois, Louisiana, Georgia and New Jersey, entered into a Consent Decree (CD), Civil Action Number H-04-3883 in the Southern District of Texas, to resolve alleged violations of the Act.

### Fluidized Catalytic Cracking Unit (FCCU)

82. Paragraph 44 of the CD provides that "CITGO will install and commence operation of a WGS [wet gas scrubber] designed to achieve an emission limit of 0.5 pounds of PM per 1000 pounds of coke burn (lb/klb coke burn) on a 3-hour average basis . . ." by no later than December 31, 2007, for the Lemont refinery FCCU.

83. Paragraph 46 of the CD provides that in accordance with NSPS regulations at 40 CFR, Part 60, Subpart J, "CITGO shall comply with an emission limit of 1.0 pounds of PM per 1000 pounds of coke burned on a 3-hour average basis . . ." by no later than December 31, 2007. *See* 40 C.F.R. § 60.102(a)(1).

12

84. Paragraph 51 of the CD provides that the Lemont refinery FCCU regenerator shall be an "affected facility," as that term is used in 40 C.F.R. Part 60, Subparts A and J, and comply with the requirements of NSPS Subparts A and J for PM by December 31, 2007.

**Heaters and Boilers**

85. Paragraph 64 a. of the CD provides that "Upon the Date of Entry, each heater and boiler that combusts refinery fuel gas at the Covered Refineries shall be an affected facility, as that term is used in 40 C.F.R. Part 60, Subparts A and J, and shall be subject to, and comply with the requirements of NSPS Subparts A and J for fuel gas combustion devices, except for those heaters and boilers listed in Appendix E, each of which shall be an affected facility and shall be subject to and comply with the requirements of NSPS Subparts A and J for fuel gas combustion devices by the dates listed in Appendix E."

86. Appendix E of the CD states that the NSPS applicability and compliance date for Units 114, 115, 116 and 125 at the refinery is July 2005.

**Sulfur Recovery Plant (SRP) and Tailgas Units (TGUs)**

87. Paragraph 67 b. of the CD provides that "[e]ffective no later than 90 days after installation of one or more TGU(s) to control the emissions from the Lemont Claus trains 119 A and B, as required under Paragraph 69, the SRP [sulfur recovery plant] at the Lemont Refinery shall be an "affected facility" under NSPS, 40 C.F.R. Part 60, Subparts A and J."

88. Paragraph 67 c. of the CD provides that "[n]otwithstanding Paragraph 67(b), above, effective on the Date of Entry of the Consent Decree until such time as the SRP at the Lemont Refinery is an "affected facility," the Lemont Claus Trains 121 C and D ('Lemont Claus Trains') shall be treated under this Consent Decree as an SRP that is an 'affected facility' that must comply with all provisions applicable to such an affected facility under 40 C.F.R. Part 60, Subparts A and J."

89. Paragraph 69 a. of the CD provides that "CITGO shall install one or more TGU(s) to control the emissions from the Lemont Claus Trains 119A and B by no later than December 31, 2008. . . . that will ensure compliance with SRP NSPS requirements by no later than December 31, 2008."

90. Paragraph 68 b. of the CD provides that "CITGO shall monitor all emission points (stacks) to the atmosphere for tail gas emissions and shall monitor and report emissions from each of these SRPs as required by 40 C.F.R. §§ 60.7(c), 60.13, and 60.105(a)(5), (6), or (7). During the life of this Consent Decree, CITGO shall conduct emissions monitoring from these SRPs with CEMS at all of the emission points, unless an $SO_2$ alternative monitoring procedure has been approved by EPA, per 40 C.F.R. § 60.13(i), for any of the emission points."

91. Paragraph 71 of the CD provides that "CITGO shall continue to route or re-route all sulfur pit emissions at the Lemont . . . refinery so that they are eliminated, controlled, or included and monitored as part of the SRP's emissions subject to the NSPS Subpart J

limit for $SO_2$, 40 C.F.R. § 60.104(a)(2), by no later than the earlier of (i) the first turnaround of the applicable Claus train that occurs on or after October 31, 2004; or (ii) March 30, 2007, provided, however, that if the Lemont Claus Trains 119A and/or 119B elect to route such emissions to the TGU required under Paragraph 69.a, then by the date of such TGU installation."

**Netting Credit Requirements**

92. Paragraph 136 of the CD prohibits the generation or use of any emission reductions as netting reductions or emissions offsets in any PSD, major non-attainment or synthetic minor NSR permit, except as provided in Paragraph 137 of the CD.

93. Paragraph 137 of the CD provides that "[n]otwithstanding the general prohibition set forth at Paragraph 136, CITGO may use up to 300 tpy of $NO_X$, 300 tpy of $SO_2$ and 20 tpy of PM from the CD Emission Reductions as credits or offsets in any PSD, major nonattainment and/or synthetic minor NSR permit or permit proceeding occurring after the Date of Lodging of the Consent Decree, provided that the new or modified emissions unit: (1) is being constructed or modified for purposes of compliance with Tier 2 gasoline or low sulfur diesel requirements; and (2) has a federally-enforceable, non-Title V Permit, with the following limits, as applicable: . . . (i) For heaters and boilers, a limit of 0.020 lbs $NO_X$ per million Btu or less on a 3-hour rolling average basis . . .."

**B.    Construction and Title V Permits**

**Construction Permit Number 01030085**

94. IEPA issued Construction Permit Number 01030085 to CITGO on August 21, 2002.

95. IEPA issued Construction Permit Number 01030085 to CITGO for the purposes of modifying and/or constructing the necessary units to allow it to produce lower sulfur gasoline by 2004, as required by the U.S. EPA Tier 2 sulfur gasoline requirements.

96. Permit Condition Number 1.1.6.e requires emission rates from the SRP not to exceed 57.33 tons CO per month and 573.32 tons CO per year.

97. Permit Condition Number 1.1.6.f requires that compliance with the emission limits in 1.1.6.e, shall be determined using a 12-month rolling average on a monthly basis.

**Title V Permit Number 96030079**

98. IEPA issued Title V Permit Number 96030079 to CITGO on January 9, 2006.

99. Permit Condition Number 7.5.6.a requires emission rates from the SRP not to exceed 57.33 tons CO per month and 573.32 tons CO per year.

100. Permit Condition Number 7.5.6.b requires that compliance with the emission limits in 7.5.6.a, shall be determined using a 12-month rolling average on a monthly basis.

101. Permit Condition Number 7.5.6.c states that the emissions in 7.5.6.a "were established in Permit 01030085 pursuant to 35 IAC Part 203 and 40 CFR 52.21. These limits ensure that the construction and/or modification addressed in the aforementioned permit does not constitute a new major source or major modification pursuant to Title 1 of the CAA, specifically 35 IAC Part 203 and 40 CFR 52.21 [T1]."

## III.   Factual Background

## A.   General Provisions

102. CITGO owns and operates a petroleum refinery at 135th Street & New Avenue, Lemont, Illinois. The refinery consists of a number of pieces of equipment that generate air pollution and are subject to provisions of the Clean Air Act. This includes a fluidized catalytic cracking unit, sulfur recovery plant, heaters, process tanks and other related equipment.

103. The CITGO refinery is a petroleum refinery included within the source categories listed at 40 C.F.R. § 52.21(b)(1)(i)(a).

104. CITGO has the potential to emit several regulated NSR pollutants in excess of 100 tpy. Therefore, the CITGO refinery is a major stationary source under the Act.

## B.   ULSD Project

105. During or about 2010, CITGO made physical and operation changes to certain process units at the refinery to enable the refinery to produce lower sulfur diesel (ULSD Project). The changes included the construction of two new heaters 590H-1 and 590H-2. The physical and operational changes to the process units arising from the ULSD Project resulted in significant net emissions increases of 234.88 tpy $NO_X$, 26.62 tpy of $PM_{10}$, and 31.33 tpy of $PM_{2.5}$.

106. By permit application 07090059, CITGO applied for a construction permit to construct the ULSD Project. CITGO used 300 tpy $NO_X$, 300 tpy $SO_2$, 20 tpy $PM_{10}$ and 20 tpy of $PM_{2.5}$ emissions reductions allegedly generated under the CD for purposes of netting in their ULSD permit application number 07090059. The net emissions change in CITGO's netting analysis with the inclusion of the CD-related emission reductions was -65.12 tpy $NO_X$, -457.83 tpy $SO_2$ and +6.62 tpy $PM_{10}$ under the PSD program, and -446.20 tpy $NO_X$ and +11.33 tpy $PM_{2.5}$ under Nnonattainment NSR.

107. The CITGO CD requires that, for CD emissions reductions to be used as credits or offsets in permitting, a federally enforceable, non-Title V permit must contain limits for heaters and boilers of 0.020 pounds of $NO_X$ per million British thermal unit (lb/MMBtu) or less on a three-hour rolling average basis.

108. John Zink, the heater vendor, provided guaranteed emissions of $NO_X$ to be 0.035 lb/MMBtu for both 590H-1 and 590H-2 based on firing CITGO Lemont's refinery fuel gas.

109. CITGO's permit issued April 21, 2010, presents limits of 0.040 lb $NO_X$/MMBtu for both heaters 590H-1 and 590H-2.

110. Heaters 590H-1 and 590H-2 do not meet the NOx emission limit of 0.020 pounds of NOx per MMBTU as specified in the CD. Because the heaters do not meet the emission limit requirements of the CD, CITGO was prohibited from using the 300 tpy of $NO_X$, 300 tpy of $SO_2$ and 20 tpy of PM reduction credits for purposes of netting in their ULSD permit application.

## C.    FCCU Wet Electrostatic Precipitator

111. Paragraph 44 of the CD required CITGO to install a wet gas scrubber (WGS) control device on the FCCU designed to achieve an emission limit of 0.5 pounds of PM per 1000 pounds of coke burned (lb/klb coke burn) on a 3-hour average. In 2006, CITGO installed a WGS with a wet electrostatic precipitator (WESP) on the FCCU.

112. CITGO conducted an emissions test at the WESP outlet associated with the FCCU regenerator, while operating the WESP on March 12, 2008. The results of this test showed PM emissions to be 0.10 lb/klb coke burn on a 3-hour average and $SO_3$ emissions to be 3.41 pounds per hour (lb/hr).

113. Beginning November 11, 2008, until the 2010 fall turnaround (TAR) was completed on October 17, 2010, the WESP was shut down due to a then unknown failure. CITGO continued to operate the FCCU while the WESP was shut down.

114. The PM emission limit in place at the time the WESP was shut down, and currently in place until an EPA established limit is provided per paragraph 46 of the CD, is the NSPS 1.0 pounds of PM per 1000 pounds of coke burned on a 3-hour average.

115. CITGO conducted an emissions test at the WESP outlet associated with the FCCU regenerator, with the WESP out of service on April 29, 2009. The results of this test showed PM emissions to be 0.44 lb/klb coke burn on a 3-hour average and $SO_3$ emissions to be 13.93 lb/hr.

116. CITGO conducted an emissions test at the WESP outlet associated with the FCCU regenerator, with the WESP out of service on June 30, and July 1, 2010. The results of this test showed PM emissions to be 1.18 lb/klb coke burn on a 3-hour average.

117. During the fall 2010 TAR, CITGO repaired and restarted the WESP.

## D.    Sulfur Recovery Plant

### Exceedance of CO Emission Limit

118. During or about 2002 - 2005, CITGO made physical and operational changes to certain process units at the refinery to enable the refinery to comply with lower sulfur gasoline requirements established by the U.S. EPA (Tier 2 Project).

119.   IEPA approved CITGO's construction permit application number 01030085 granting CITGO permission to modify and/or construct the necessary process units to allow it to produce lower sulfur gasoline by 2004, as required by the U.S. EPA Tier 2 gasoline requirements.

120.   Construction permit condition 1.1.6.e requires emission rates from the SRP not to exceed 57.33 tons of CO per month and 573.32 tons of CO per year. IEPA established the limits to ensure that the Tier 2 Project would not trigger New Source Review.

121.   Construction Permit condition 1.1.6.f requires that compliance with the emission limits in 1.1.6.e be determined using a 12-month rolling average on a monthly basis.

122.   CITGO's Title V Permit number 96030079 at condition 7.5.6.a limits the carbon monoxide (CO) emissions from the SRP to 57.33 tons of CO per month and 573.32 tpy.

123.   Title V permit condition 7.5.6.c states that the emission limits in 7.5.6.a "were established in Permit 01030085 pursuant to 35 IAC Part 203 and 40 CFR 52.21 . . . [to] ensure that the construction and/or modification addressed in the aforementioned permit does not constitute a new major source or major modification pursuant to Title I of the CAA . . .."

124.   CITGO, as self reported in their annual emission report, exceeded both their monthly and annual CO emission rates in 2005, 2006, 2007, and 2008. The table below shows the monthly average emissions of CO and the total annual CO emissions from the SRP that includes trains A, B, C, and D combined.

| Year | Total Emission Rate (ton/month) | Total Emission rate (ton/year) |
|------|-------------------------------|-------------------------------|
| 2008 | 68.38 | 820.62 |
| 2007 | 68.42 | 821.09 |
| 2006 | 58.89 | 706.74 |
| 2005 | 65.18 | 782.19 |

**Sulfur Pit Emissions**

125.   EPA conducted an inspection of the Lemont refinery to assess compliance with the Act and the CD on June 7-11, 2010.

126.   During a facility tour on June 8, 2010, EPA observed a yellow residue surrounding the top of the air intake piping on SRP train D. This indicates venting of the sulfur pit through the air intake to the atmosphere.

127. Pursuant to paragraphs 67 and 69 of the CD, the SRP became an affected facility under NSPS Subparts A and J by December 31, 2008. Trains C and D of the SRP have been treated by the CD as an affected facility under NSPS Subparts A and J since the date of entry of the CD, October 6, 2004.

## E. CEMS Downtime

128. CITGO's Units 121C and 121D are sulfur recovery trains and have been treated by the CD as an affected facility under NSPS Subparts A and J since the date of entry of the CD, October 6, 2004.

129. CITGO's Units 114, 115, 116, and 125 are the Crude Unit #2, the light distillate hydrotreater, the naphtha desulfurizer, and the diesel distillate hydrotreater, respectively. All of these units are fuel gas combustion devices and have been affected facilities under NSPS Subparts A and J since July 2005.

130. The table below summarizes the CEMS downtime for CITGO's Units 121C, 121D, 114, 115, 116, and 125 from 2005-2009.

| Unit(s) | Time Period | % CEMS Downtime | Pollutant |
|---|---|---|---|
| 121C | 2005-2009 | 4.96 | $SO_2$ |
| 121D | 2005-2009 | 4.49 | $SO_2$ |
| 114/116 FG | 3rd Quarter 2005-2009 | 5.96 | $H_2S$ |
| 115/125 FG | 3rd Quarter 2005-2009 | 5.87 | $H_2S$ |

## F. Hazardous Organic NESHAP – 40 C.F.R. Part 63, Subpart H, Benzene Purge

131. CITGO's Title V Permit at condition 7.8.3.d., provides that refinery unit 122, the UDEX unit, is subject to the equipment leak requirements of the HON rule, 40 C.F.R. Part 63, Subpart H.

132. During the June 2010 inspection, EPA observed a CITGO employee take a benzene sample. Some liquid was purged into a separate container before the sample was taken.

133. Pursuant to CITGO's benzene purge handling procedures, the purged liquid is taken to the laboratory with the sample to be tested, and both the purged liquid and the sample eventually get transferred to a separate container. When this container is full it is delivered to a 90-day storage area, where a vacuum truck is used to empty the container and transfer the material into the refinery slop oil system.

134. On February 24, 2011, EPA observed the vacuum truck loading the benzene-containing waste from the container. Photoionization detectors (PIDs) indicated that benzene was being emitted from the vacuum truck's vacuum pump exhaust.

135. THE PID test demonstrates that as the benzene-containing waste is loaded into the vacuum truck, some of the benzene is vaporizing and escaping out of the vacuum truck's vacuum pump exhaust, thus causing the benzene emission observed using the PIDs.

136. The presence of benzene in the vacuum truck's vacuum pump exhaust is credible evidence that some of the benzene sample's purged liquid is escaping to the atmosphere.

## IV.   Violations

### A.   New Source Review

### ULSD Project

137. The physical and operational changes made to process units under the ULSD Project, as described in Paragraphs 108 - 113, resulted in significant net emissions increases, as defined at 40 C.F.R. §§ 52.21(b)(3)(i) and (b)(23)(i); 35 IAC §§ 203.206(b)(3) and Part 51, Appendix S at II.A.6(i) and II.A.10(i), of $NO_X$, $PM_{10}$ and $PM_{2.5}$, which constitute a major modification of a major stationary source under the provisions referenced above.

138. CITGO failed to obtain a PSD/non-attainment NSR permit for the physical and operational changes made to process units under the ULSD Project, as required by Sections 165(a) and 173(a) of the Act, 40 C.F.R. §§ 52.21 and 51.165, 40 C.F.R. Part 51, Appendix S, IV.A., and the Illinois SIP, including 35 IAC § 203.201.

139. CITGO violated, and continues to violate, Sections 165(a) and 173(a) of the Act, 40 C.F.R. §§ 52.21 and 51.165, 40 C.F.R. Part 51, Appendix S, IV.A., and the Illinois SIP, including 35 IAC § 203.201, by constructing a major modification at the refinery that resulted in a significant net emissions increase of $NO_X$, $PM_{10}$, and $PM_{2.5}$ without applying for or obtaining a PSD/non-attainment NSR permit, operating the modified facility without installing BACT and LAER for the control of such pollutants prior to commencing construction of such activities, and continues to operate the refinery without BACT/LAER and obtaining Federally enforceable emission offsets as great or greater as the new or modified source's emissions. CITGO violated and continues to violate these provisions by failing to install the appropriate emission control equipment in accordance with BACT and LAER analyses, certifying that all other major sources that it owns or operates within Illinois are in compliance with the Act, and demonstrating that the benefits of the proposed source or modification significantly outweigh the environmental and social costs imposed as a result of its construction or modification.

### FCCU Wet Electrostatic Precipitator

140. The physical and operational changes made to the FCCU WESP, as described in Paragraphs 114 - 120, resulted in significant net emissions increases, as defined at 40

C.F.R. §§ 52.21(b)(3)(i) and (b)(23)(i), of PM, PM₁₀ and sulfuric acid mist, which constitute a major modification of a major stationary source.

141. CITGO failed to obtain a PSD permit for the physical and operational changes made to the FCCU WESP, as required by Section 165(a) of the Act, 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21(i)(1) and the Illinois SIP.

142. CITGO violated Section 165(a) of the Act, 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21(i)(1) and the Illinois SIP by changing the method of operation of a major stationary source that resulted in a significant emissions increase of PM, PM₁₀ and sulfuric acid mist without applying for or obtaining a PSD permit, and operating the modified facility without installing BACT, going through PSD review, and installing appropriate emission control equipment in accordance with a BACT analysis.

**Sulfur Recovery Plant – Exceedance of CO Emissions**

143. The physical and operational changes made to the SRP, as described in Paragraph 121 - 127, resulted in significant net emissions increases, as defined at 40 C.F.R. §§ 52.21(b)(3)(i) and (b)(23)(i), of CO, which constitute a major modification of a major stationary source.

144. CITGO failed to obtain a PSD permit for the physical and operational changes made to process unit as required by 40 C.F.R. § 52.21(i)(1) and the Illinois SIP.

145. CITGO violated Section 165(a) of the Act, 42 U.S.C. § 7475(a), 40 C.F.R. § 52.21(i)(1) and the Illinois SIP by constructing a major modification at the refinery that resulted in a significant emissions increase of CO without applying for or obtaining a PSD permit, and operating the modified facility without installing BACT, or going through PSD review, and installing appropriate emission control equipment in accordance with a BACT analysis.

**B.    New Source Performance Standards**

**FCCU Wet Electrostatic Precipitator**

146. As described in Paragraphs 114 - 120, from November 11, 2008 through September 14, 2010, CITGO failed to operate the WESP "air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions," pursuant to 40 CFR § 60.11(d).

147. As described in Paragraphs 114 - 120, beginning on June 30, 2010, CITGO failed to comply with 1.0 lb PM/klb coke burn on a 3-hour average, in violation of NSPS Subpart J, 40 C.F.R. § 60.102(a)(1).

**CEMS Downtime**

148. As described in Paragraphs 131 - 133, CITGO failed to continuously operate the CEMS on Unit 121C, Unit 121D, Unit 114/116, and Unit 115/125 in violation of 40 C.F.R. §§ 60.13(e), 60.105(a)(1), (4) and(5).

**C.      NESHAP for Equipment Leaks - Benzene Purge**

149. As described in Paragraphs 134 - 139, CITGO failed to control the emissions of the benzene sample's purged liquid from the vacuum truck's vacuum pump exhaust in violation of 40 C.F.R. Part 63, Subpart H, § 63.166(b).

**D.      Consent Decree**

**ULSD Project**

150. As described in Paragraphs 105 - 113, CITGO used netting credits for $NO_X$, $SO_2$ and PM generated from projects conducted or controls required by the CD without having a federally-enforceable $NO_X$ limit of 0.020 lb/MMBtu on the heaters being modified, in violation of paragraphs 136 and 137 of the CD.

**FCCU Wet Electrostatic Precipitator**

151. As described in Paragraphs 113 - 120, beginning on June 30, 2010, CITGO failed to comply with 1.0 lb PM/klb coke burn on a 3-hour average at the FCCU, in violation of paragraph 46 of the CD.

**Sulfur Recovery Plant-Sulfur Pit Emissions**

152. As described in Paragraphs 128 - 130, CITGO failed to route or re-route all sulfur pit emissions at the Lemont refinery to eliminate, control, or include and monitor them as part of the SRP's emissions, in violation of paragraph 71 of the CD.

**CEMS Downtime**

153. As described in Paragraphs 131 - 133, CITGO failed to continuously operate the CEMS on Units 121C, 121D, 114, 115, 116, and 125 in violation of paragraphs 64(a), 67(b), 67(c), and 68(b) of the CD.

**E.      Title V**

**ULSD Project**

154. Since August 2010, CITGO has failed to submit a timely and complete Title V permit application for the Lemont refinery with information pertaining to the modification described in Paragraphs 103 - 108 and with information concerning all applicable requirements, including, but not limited to, the requirement to apply, install and operate BACT for $NO_X$ and $PM_{10}$ and LAER with offsets for $PM_{2.5}$ and also failed to supplement

or correct the Title V permit applications in violation of Sections 502, 503 and 504 of the Act, 42 U.S.C. §§ 7661a, 7661b and 7661c; the regulations at 40 C.F.R. Part 70, including, but not limited to, 40 C.F.R. §§ 70.1(b), 70.5(a), (b) and (c), and 70.6 and 70.7(b); and the Illinois Title V provisions at 415 ILCS 5/39.5.

**FCCU Wet Electrostatic Precipitator**

155. Since November 11, 2008, CITGO has failed to submit a timely and complete Title V permit application for the Lemont refinery with information pertaining to the modification described in Paragraphs 109 - 115 and with information concerning all applicable requirements, including, but not limited to, the requirement to apply, install and operate BACT for PM, and $SO_3$ and also failed to supplement or correct the Title V permit applications in violation of Sections 502, 503 and 504 of the Act, 42 U.S.C. §§ 7661a,7661b and 7661c; the regulations at 40 C.F.R. Part 70, including, but not limited to, 40 C.F.R. §§ 70.1(b), 70.5(a), (b) and (c), and 70.6 and 70.7(b); and the Illinois Title V provisions at 415 ILCS 5/39.5.

**Sulfur Recovery Plant-Exceedance of CO Emissions**

156. Since January 2006, CITGO has failed to submit a timely and complete Title V permit application for the Lemont refinery with information pertaining to the modification described in Paragraphs 116 - 122 and with information concerning all applicable requirements, including, but not limited to, the requirement to apply, install and operate BACT for CO and also failed to supplement or correct the Title V permit applications in violation of Sections 502, 503 and 504 of the Act, 42 U.S.C. §§ 7661a,7661b and 7661c; the regulations at 40 C.F.R. Part 70, including, but not limited to, 40 C.F.R. §§ 70.1(b), 70.5(a), (b) and (c), and 70.6 and 70.7(b); and the Illinois Title V provisions at 415 ILCS 5/39.5.

157. From 2005 to 2009, CITGO exceeded both the monthly and yearly CO emission rates at the SRU, in violation of Permit Condition 7.5.6 of Permits 96030079 and 01030085.

**F.    Enforcement Provisions**

158. Sections 113(a)(1) and (3) of the Act, 42 U.S.C. § 7413(a)(1) and (3), provide that the Administrator may bring a civil action in accordance with Section 113(b) of the Act, 42 U.S.C. § 7413(b), whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of, *inter alia*, the PSD requirements of Part C of Title 1 of the Act, 42 U.S.C. §§ 7470-7492, and regulations thereunder, including 40 C.F.R. § 52.21; Part D of Title 1 of the Act, §§ 7501-7515, and regulations thereunder, including 40 C.F.R. Part 51, § 51.165 and App. S; Section 111 of the Act, and regulations thereunder, including 40 C.F.R. Part 60, and Subparts A and J; Section 112 of the Act, and regulations thereunder, including 40 C.F.R. Part 63, Subpart H; Title V of the Act, 42 U.S.C. §§ 7661-7661f, or any regulation or permit issued thereunder; and the PSD and NA NSR provisions of the Illinois SIP. *See also* 40 C.F.R. § 52.23.

159. Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the Administrator to initiate a judicial enforcement action for a permanent or temporary injunction, and/or for a civil penalty of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each such violation occurring on or after January 31, 1997 and up to and including March 15, 2004; up to $32,500 per day for each such violation occurring on or after March 16, 2004 through January 12, 2009; and up to $37,500 per day for each such violation occurring on or after January 13, 2009, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, 40 C.F.R. § 19.4, and 74 Fed. Reg. 626 (Jan. 7, 2009) against any person whenever such person has violated, or is in violation of, *inter alia,* the requirements or prohibitions described in the preceding paragraph.

160. Section 167 of the Act, 42 U.S.C. § 7477, authorizes the Administrator to initiate an action for injunctive relief, as necessary to prevent the construction, modification or operation of a major emitting facility which does not conform to the PSD requirements in Part C of the Act.

161. Section 167 of the Act, 42 U.S.C. § 7477, authorizes the Administrator to initiate an action for injunctive relief, as necessary to prevent the construction, modification or operation of a major emitting facility which does not conform to the non-attainment NSR requirements in Part D of the Act.

9/30/11
_____
Date

_____
Cheryl L. Newton
Director
Air and Radiation Division

## CERTIFICATE OF MAILING

I, Tracy Jamison, certify that I sent a Notice and Finding of Violation,

No. EPA-5-11-IL-10, by Certified Mail, Return Receipt Requested, to:

> Claude Harmon
> Manager HSS&E
> CITGO Petroleum Corporation
> 135th Street and New Avenue
> Lemont, Illinois 60439

I also certify that I sent copies of the Notice of Violation and Finding of Violation by first-class mail to:

> Ray Pilapil, Manager
> Compliance and Systems Management Section
> Illinois Environmental Protection Agency
> 1021 North Grand Avenue
> Springfield, Illinois 62702

On the 30 day of September 2011.

CERTIFIED MAIL RECEIPT NUMBER: 7009 1680 0000 7673 8613

Tracy Jamison,
Office Automation Assistant
AECAB, PAS